# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| DIEGO IGNACIO MURGUIA, derivatively on behalf of READY CAPITAL CORPORATION and BROADMARK REALTY CAPITAL INC., <br><br> c/o Timothy Brown Esq. <br> The Brown Law Firm, P.C. <br> 767 Third Avenue, Suite 2501 <br> New York, NY 10017 <br><br>      *Plaintiff*, <br><br>      v. <br><br> BROADMARK REALTY CAPITAL INC., <br> 1420 Fifth Avenue, Suite 2000, <br> Seattle, WA 98101, <br><br>      Serve on: <br>      THE CORPORATION TRUST INCORPORATED <br>      2405 York Road, <br>      Suite 201 <br>      Lutherville Timonium, MD 21093-2264 <br><br> *Nominal Defendant*, <br><br> and <br><br> READY CAPITAL CORPORATION, <br> 1251 Avenue of the Americas, 50th Floor, <br> New York, NY 10020 <br><br>      Serve on: <br>      THE CORPORATION TRUST INCORPORATED <br>      2405 York Road, <br>      Suite 201 <br>      Lutherville Timonium, MD 21093-2264 <br><br> *Nominal Defendant*, <br><br> and <br><br> THOMAS E. CAPASSE <br> c/o Ready Capital Corporation | Case No. <br><br><br><br> **DEMAND FOR JURY TRIAL** |

1251 Avenue of the Americas, 50th Floor,
New York, NY 10020

and

ANDREW AHLBORN
c/o Ready Capital Corporation
1251 Avenue of the Americas, 50th Floor,
New York, NY 10020

and

MEREDITH MARSHALL
c/o Ready Capital Corporation
1251 Avenue of the Americas, 50th Floor,
New York, NY 10020

and

DOMINIQUE MIELLE
c/o Ready Capital Corporation
1251 Avenue of the Americas, 50th Floor,
New York, NY 10020

and

GILBERT NATHAN
c/o Ready Capital Corporation
1251 Avenue of the Americas, 50th Floor,
New York, NY 10020

and

J. MITCHELL REESE
c/o Ready Capital Corporation
1251 Avenue of the Americas, 50th Floor,
New York, NY 10020

and

JACK J. ROSS
c/o Ready Capital Corporation
1251 Avenue of the Americas, 50th Floor,
New York, NY 10020

and

TODD M. SINAI
c/o Ready Capital Corporation

1251 Avenue of the Americas, 50th Floor,
New York, NY 10020
and

JEFFREY B. PYATT
c/o Ready Capital Corporation
1251 Avenue of the Americas, 50th Floor,
New York, NY 10020

and

JONATHAN R. HERMES
c/o Ready Capital Corporation
1251 Avenue of the Americas, 50th Floor,
New York, NY 10020

and

KEVIN M. LUEBBERS
c/o Ready Capital Corporation
1251 Avenue of the Americas, 50th Floor,
New York, NY 10020

and

DANIEL J. HIRSCH
c/o Ready Capital Corporation
1251 Avenue of the Americas, 50th Floor,
New York, NY 10020

and

PINKIE D. MAYFIELD
c/o Ready Capital Corporation
1251 Avenue of the Americas, 50th Floor,
New York, NY 10020

and

STEPHEN G. HAGGERTY
c/o Ready Capital Corporation
1251 Avenue of the Americas, 50th Floor,
New York, NY 10020

and

DAVID A. KARP
c/o Ready Capital Corporation
1251 Avenue of the Americas, 50th Floor,
New York, NY 10020

and

NORMA A. LAWRENCE
c/o Ready Capital Corporation
1251 Avenue of the Americas, 50th Floor,
New York, NY 10020

and

FRANK P. FILIPPS
c/o Ready Capital Corporation
1251 Avenue of the Americas, 50th Floor,
New York, NY 10020

and

ANDREA PETRO
c/o Ready Capital Corporation
1251 Avenue of the Americas, 50th Floor,
New York, NY 10020

and

WATERFALL ASSET MANAGEMENT, LLC
c/o Ready Capital Corporation
1251 Avenue of the Americas, 50th Floor,
New York, NY 10020

*Defendants.*

## VERIFIED SHAREHOLDER DOUBLE DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Diego Ignacio Murguia ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendants Ready Capital Corporation ("Ready Capital") and Broadmark Realty Capital Inc. ("Broadmark" or "the Company"), files this Verified Shareholder Double Derivative Complaint against Thomas E. Capasse ("Capasse"), Andrew Ahlborn ("Ahlborn"), Meredith Marshall ("Marshall"), Dominique Mielle ("Mielle"), Gilbert Nathan ("Nathan"), J. Mitchell Reese ("Reese"), Jack J. Ross ("Ross"), Todd M. Sinai ("Sinai"),

4

Frank P. Filipps ("Filipps") (collectively, the "Ready Capital Individual Defendants"), Jeffrey B. Pyatt ("Pyatt"), Jonathan R. Hermes ("Hermes"), Kevin M. Luebbers ("Luebbers"), Daniel J. Hirsch ("Hirsch"), Pinkie D. Mayfield ("Mayfield"), Stephen G. Haggerty ("Haggerty"), David A. Karp ("Karp"), Norma J. Lawrence ("Lawrence"), and Andrea Petro ("Petro") (collectively, the "Broadmark Individual Defendants," and together with the Ready Capital Individual Defendants, the "Individual Defendants"),  and Waterfall Asset Management, LLC ("Waterfall") (collectively with the Individual Defendants, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Broadmark, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against the Defendants for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Broadmark and Ready Capital, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder double derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from April 20, 2023 to March 3, 2025, both dates inclusive (the "Relevant Period").

2.      The double derivative claims asserted in this Complaint are the claims that belong to Broadmark, which is the wholly owned subsidiary of Ready Capital, and are thus claims that ultimately belong to Ready Capital.

3.      Broadmark is a real estate investment trust ("REIT") based in Seattle, Washington, which typically caters to real estate investors, developers, and similar commercial borrowers. Broadmark uses loan proceeds to fund vertical construction and horizontal development, investment, land acquisition, and refinancing of both residential and commercial properties. Broadmark also provides loans for funding the renovation and rehabilitation of various properties. Broadmark's loans are typically structured such that they provide an initial advance at closing, and additional loan installments are later disbursed to the borrower on satisfactory completion of previously-agreed construction milestones.

4.      Ready Capital is a real estate finance company specializing in lower-to-middle market ("LMM") loans, commercial real estate ("CRE") loans, small business administration ("SBA") loans, residential mortgage loans, construction loans, and other real estate-related investments. Ready Capital's primary strategy is targeting small-to-medium balance commercial ("SBC") loans used to develop multifamily residential properties. According to the Company, the original principal amounts of the loans Ready Capital offers range up to $40 million, and Ready Capital offers such loans to finance the full life cycle of properties, which encompasses, *inter alia*, initial construction, bridge financing, and stabilized properties.

5.      The Relevant Period began on April 20, 2023 when Broadmark filed a Form DEFM14A with the SEC (the "Joint Proxy") to solicit shareholders to vote in support of Broadmark's anticipated merger with Ready Capital (the "Merger"). That same day, Ready Capital also filed the Joint Proxy on Form 424B3 with the SEC. A prefatory letter to the Joint Proxy stated that the record date for the special meeting of shareholders was set for April 17, 2023, and that the vote would occur on May 30, 2023. On May 23, 2023, Broadmark filed supplements to the Joint Proxy on Form 425 with the SEC.

6.      Upon approval, the Merger was to proceed pursuant to the Agreement and Plan of Merger (the "Merger Agreement") with Ready Capital and its wholly owned subsidiary RCC Merger Sub, LLC (the "Merger Subsidiary"). Pursuant to the Merger, each share of Broadmark common stock outstanding at the effective time of the Merger was to be converted into the right to receive 0.47233 shares of Ready Capital common stock.

7.      The Joint Proxy emphasized the potential value creation the Merger would provide for Broadmark's shareholders, as well as the "[p]otential for [i]ncreased [m]ultiples and [d]ividend[s]" to result from the Merger. The Joint Proxy further promised that the combined company would enjoy better "economic and operational" leverage that would create the opportunity for "higher and more consistent dividend[s]" and "improved price to tangible book value and earnings multiples." The Joint Proxy also, crucially, represented that the SBC loans Ready Capital had acquired from a previous merger with Mosaic Real Estate Credit, LLC, Mosaic Real Estate Credit TE, LLC, and MREC International Incentive Split, LP (collectively, "Mosaic"), had an unpaid principal balance of "$2.0 billion and a carrying value of $2.0 billion as of December 31, 2022." In addition, the Joint Proxy represented that Ready Capital's own originated SBC loans

had unpaid principal balances totaling "$7.6 billion and a carrying value of $7.5 billion as of December 31, 2022," and furthermore, that these were "substantially" performing loans.

8.    Based on the materially false and/or misleading statements made in the Joint Proxy, Broadmark's shareholders voted to approve the Merger, which closed on May 31, 2023.

9.    However, despite Defendants' assertions to the contrary, the Merger proved to be significantly harmful to former Broadmark shareholders. Indeed, the Ready Capital shares that Broadmark shareholders voted to receive pursuant to the Merger ultimately dropped dramatically from $10.11 per share at the end of trading on the Merger's closing date to lows of less than $4 per share.

10.    The truth fully emerged on March 3, 2025, before the market opened, when Ready Capital issued an earnings release announcing its fourth quarter and full year 2024 financial results. The press release stated that the Company had increased its Current Expected Credit Loss ("CECL") reserve during the quarter by $227 million, which reduced the book value per share of the Company's common stock to $10.61, a noticeable decline from the $15.10 per share figure projected in the Joint Proxy. Furthermore, the release announced that the Company was reducing its cash dividend to $0.125 per share for common stock to better "align with anticipated cash earnings." This was a significant shortcoming, considering the Joint Proxy had projected a dividend of *1.60 per share* for fiscal 2025. Finally, the release noted that Ready Capital had generated only $0.07 in distributable earnings per share for fiscal 2024—only $0.97 of distributable earnings before realized losses on investments, net tax—which was a far cry from the $1.60 in distributable earnings per share projected by the Joint Proxy.

11.    On this news, Ready Capital's stock price declined $1.86 per share, or approximately **26.80%**, from a closing price of $6.93 per share on March 2, 2025, to close at $5.07 per share on March 3, 2025, on unusually heavy trading volume.

12.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company and/or Ready Capital to make false and misleading statements that failed to disclose, *inter alia,* that: (1) a material portion of borrowers within Ready Capital's originated portfolio were experiencing significant financial distress due to high interest rates that had increased their borrowing costs; (2) an oversupply of multifamily properties in Ready Capital's markets had severely limited its borrowers' ability to raise their rents sufficiently to cover their growing debt costs; (3) a major development project acquired in the Mosaic Merger (a Ritz-Carlton located in Portland, Oregon), accounting for approximately $500 million of Ready Capital's acquired loan portfolio, had experienced catastrophic setbacks since its inception, including significant cost overruns, construction delays, and funding shortfalls; (4) that, as a result of (1)–(3) above, Ready Capital's CECL reserves and expected credit losses were materially understated; (5) that, as a result of (1)–(4) above, Ready Capital's financial projections regarding Ready Capital's Distributable Earnings per share, dividends per share, and book value per share had no basis in fact when made; and (6) due to the foregoing, the Merger would cause substantial harm to Broadmark shareholders. As a result of the foregoing, Ready Capital's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

13.     The Individual Defendants further breached their fiduciary duties by failing to correct and/or causing the Company and/or Ready Capital to fail to correct the false and misleading statements and omissions of material fact alleged herein, while, during the Relevant Period, they caused Ready Capital to repurchase its own common stock at prices that were artificially inflated due to the foregoing misrepresentations. In total, they caused Ready Capital to overpay for repurchases of approximately 12.6 million shares of its own common stock by approximately $41.5 million.

14.     In light of the Individual Defendants' misconduct—which has subjected Broadmark, its Chief Executive Officer ("CEO"), Chief Investment Officer ("CIO"), its Chief Financial Officer ("CFO"), and its entire Board, and Ready Capital to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Maryland (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—Broadmark will have to expend many millions of dollars.

15.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, which includes the entire current Ready Capital Board of Directors (the "Ready Capital Board"), of the collective engagement in fraud and misconduct by the Company's directors and Ready Capital's directors, of the substantial likelihood of the directors' liability in this double derivative action, of the CEO, CIO's and CFO's, and the Ready Capital Board's liability in the Securities

10

Class Action, and of their not being disinterested and/or independent directors, a majority of the Ready Capital Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 of the Exchange act (17 C.F.R. § 240.14-a-9). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

18.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.    Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

21.    Plaintiff is a current shareholder of Ready Capital common stock. Plaintiff continuously held Broadmark stock since August 26, 2022, and has continuously owned Ready

Capital common stock since May 31, 2023, when Ready Capital effected a merger with Broadmark that resulted in a newly combined business entity pursuant to its agreement and plan of merger.

### Nominal Defendant Ready Capital

22.     Ready Capital is a Maryland corporation with its principal executive offices at 1251 Avenue of the Americas, 50th Floor, New York, NY 10020. Ready Capital's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "RC."

### Nominal Defendant Broadmark

23.     Broadmark was a Maryland corporation with its principal executive offices at 1420 Fifth Avenue, Suite 2000, Seattle, WA 98101. Broadmark's common stock traded on the NYSE under the ticker symbol "BMRK" before the Merger.

### Defendant Capasse

24.     Defendant Capasse has served as Ready Capital's CEO and as Chairman of the Ready Capital Board since October 2016. Defendant Capasse has also served as Ready Capital's Chief Investment Officer ("CIO") since November 2022. Defendant Capasse is also a co-founder and manager of Waterfall.

25.     During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Capasse made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 08/15/2023 | 26,623 | $10.7 | $284,866.10 |

26.     Ready Capital's Schedule 14A filed with the SEC on April 29,  2025 (the "2025 Proxy Statement") stated the following about Defendant Capasse:

**EXPERIENCE**

- Mr. Capasse has served as the Chairman of our board of directors and our Chief Executive Officer since October 2016.
- Mr. Capasse has also served as our Chief Investment Officer since November 2022, and is a Manager and co-founder of Waterfall Asset Management, LLC (our "Manager"). Prior to founding Waterfall, Mr. Capasse managed the principal finance groups at Greenwich Capital from 1995 until 1997, Nomura Securities from 1997 until 2001, and Macquarie Securities from 2001 until 2004.
- Mr. Capasse has significant and long-standing experience in the securitization market as a founding member of Merrill Lynch's ABS Group (1983–1994) with a focus on mortgage-backed securities ("MBS") transactions (including the initial Subprime Mortgage and Manufactured Housing ABS) and experience in many other ABS sectors.
- Mr. Capasse began his career as a fixed income analyst at Dean Witter and Bank of Boston.

**EDUCATION**

- Mr. Capasse received a Bachelor of Arts degree in Economics from Bowdoin College.

**QUALIFICATIONS**

Mr. Capasse is well qualified to serve as a director due to his institutional knowledge with respect to our Company and as a co-founder of our Manager

**Defendant Ahlborn**

27.    Defendant Ahlborn has served as Ready Capital's CFO since March 2019. During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Ahlborn made the following sale of Ready Capital common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 01/09/2024 | 3,302 | $33,020.00 | $10.00 |
| 02/12/2024 | 8,409 | $77,446.89 | $9.21 |
| 02/03/2025 | 48,122 | $316,642.76 | $6.58 |
| 02/12/2025 | 9,016 | $55,538.56 | $6.16 |

| 02/22/2025 | 16,355 | $109,905.60 | $6.72 |

28.    The Form 10-K which Ready Capital filed with the SEC on March 3, 2025 for the

year ended December 31, 2024 (the "2024 10-K") stated the following about Defendant Ahlborn:

Andrew Ahlborn, 41 is our Chief Financial Officer. Mr. Ahlborn joined Waterfall in 2010 and was previously our Controller. Prior to joining Waterfall, he worked in Ernst & Young, LLP's Financial Services Office. Mr. Ahlborn received a Bachelor of Science degree in Accounting from Fordham University's Gabelli School of Business and a Master of Business Administration through Columbia Business School. He is a licensed Certified Public Accountant in New York.

**Defendant Marshall**

29.    Defendant Marshall has served as a Ready Capital director since December 2022

and currently serves as a member of the Compensation Committee the Nominating and Corporate

Governance Committee.

30.    The 2025 Proxy Statement stated the following about Defendant Marshall:

**EXPERIENCE**

- Mr. Marshall is one of our independent directors and has served as a member of our board of directors since December 2022.
- Mr. Marshall is the co-founder and Managing Partner of BRP Companies ("BRP"), a vertically integrated owner, operator, developer and manager of transit-oriented, mixed-use, multifamily properties in the New York Tri-State area. Mr. Marshall is responsible for executing BRP's investment strategy, including deal origination, acquisition, finance and development.
- Prior to co-founding BRP, Mr. Marshall was a Managing Director at Musa Capital Advisors ("Musa Capital"), an emerging markets private equity and financial advisory firm based in New York City that managed a separate account for Kingdom Holding Africa, HRH's Prince Alwaleed Bin Talal's investment vehicle for Sub-Saharan Africa. At Musa Capital, Mr. Marshall was instrumental in executing cross-border transactions, including the $37 million development of a mixed-use office complex and mall in Harare, Zimbabwe.
- Mr. Marshall also led successful investments in the telecommunications and financial services sectors. Prior to Musa Capital, Mr. Marshall was a senior associate at Wasserstein Perella & Co. ("Wasserstein"), an investment banking firm based in New York City. While at Wasserstein, Mr. Marshall was an integral member of the firm's telecommunications and media, mergers and acquisitions practice, where he assisted in transactions exceeding $15 billion.

- Mr. Marshall is a founding member of the Council of Urban Professionals and a member of the Executive Board of the New York State Affordable Housing Association. Mr. Marshall also proudly serves on the Real Estate Board of New York Board of Governors, Enterprise NYC Advisory Board and Citizens Housing and Planning Council Board.

**EDUCATION**

- Mr. Marshall holds a Bachelor of Science degree in Electrical Engineering from Boston University and a Master of Business Administration degree in Finance and International Business from Columbia Business School.

**QUALIFICATIONS**

We believe that Mr. Marshall is well qualified to serve as a director due to his extensive experience in real estate finance and affordable housing.

**<u>Defendant Mielle</u>**

31.     Defendant Mielle has served as a Ready Capital director since March 2021 and currently serves as the Chair of the Audit Committee and as a member of the Compensation Committee.

32.     The 2025 Proxy Statement stated the following about Defendant Mielle:

**EXPERIENCE**

- Ms. Mielle is one of our independent directors and has served on our board of directors since March 2021, following the completion of our merger transaction with Anworth Mortgage Asset Corporation ("Anworth"), Ms. Mielle served on the board of directors of Anworth prior to the merger transaction.
- Ms. Mielle also serves on the boards of Studio City International Holdings Limited, which operates an entertainment resort, and Tiptree Inc., which provides specialty insurance and investment management services.
- Ms. Mielle was a Partner at Canyon Capital Advisors, LLC ("Canyon") from August 1998 to December 2017, where she focused on the transportation, technology, retail and consumer products sectors, specialized in corporate and municipal bond securitizations, and was responsible for all aspects of Canyon's collateralized loan obligations business.
- Prior to joining Canyon, in 1996, Ms. Mielle worked at Libra Investments, Inc. as an associate in the corporate finance department, covering middle market companies.

- Prior to Libra Investments, from 1993 to 1995, Ms. Mielle worked at Lehman Brothers as an analyst in the Financial Institutions group, focusing on mergers and acquisitions.

**EDUCATION**

- Ms. Mielle holds a Master of Business Administration degree in Finance from Stanford University and a Master in Management degree from École des Hautes Études Commerciales in France (HEC Paris). She was named one of the "Top 50 Women in Hedge Funds" by Ernst & Young in 2017.

**QUALIFICATIONS**

We believe that Ms. Mielle is well qualified to serve as a director due to her extensive experience investing in fixed income and leading capital structure optimizations and restructurings

**Defendant Nathan**

33.    Defendant Nathan has served as a Ready Capital director since March 2019. Defendant Nathan also serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee.

34.    The 2025 Proxy Statement stated the following about Defendant Nathan:

**EXPERIENCE**

- Mr. Nathan is one of our independent directors and has served on our board of directors since March 2019, following the completion of our merger transaction with Owens Realty Mortgage, Inc. ("ORM") and served on the board of directors of ORM from August 2018 through the completion of the merger transaction. •He has served as the Managing Member and a Director of Jackson Square Advisors LLC, a financial advisory and services firm, since September 2015.
- He has served as a Director for Alto Ingredients, Inc (Nasdaq: ALTO) since November 2019 and Magnachip Semiconductor Corporation (NYSE: MX) since May 2023.
- Mr. Nathan is currently the Plan Administrator for Mission Coal Wind Down Co. LLC and the Chief Executive Officer of Cloud Peak Energy.
- From June 2018 to December 2021, Mr. Nathan served as a board member of Hercules Offshore Liquidating Trust for Hercules Offshore, Inc.
- He also served as the liquidating trustee of BPZ Liquidating Trust for BPZ Resources, Inc. from November 2015 to May 2017.

- From November 2015 to July 2017, he served as a Director of Emergent Capital, Inc. (NYSE: EMG), a specialty finance company.
- From July 2013 to August 2015, Mr. Nathan was a senior analyst with Candlewood Investment Group, an investment firm, and prior to that, he was a Principal with Restoration Capital Management from 2002 to 2012.

**EDUCATION**

- Mr. Nathan earned a Bachelor of Science degree in Management from Tulane University.

**QUALIFICATIONS**

We believe that Mr. Nathan is well qualified to serve as a director due to his industry technical expertise and knowledge of financial markets

### **Defendant Reese**

35.     Defendant Reese has served as a Ready Capital director since October 2016 and as Lead Independent Director since April 2025. Defendant Reese also serves as Chairman of the Nominating and Corporate Governance Committee and as a member of the Audit Committee.

36.     The 2025 Proxy Statement stated the following about Defendant Reese:

**EXPERIENCE**

- Mr. Reese is one of our independent directors and has served as a member of our board of directors since October 2016 and our Lead Independent Director since April 2025.
- From November 2013 to October 2016 Mr. Reese served as a member of the board of directors of Sutherland Asset Management Corporation which merged with our Company in October 2016 whereupon Mr. Reese became a member of our board of directors.
- He has been the Managing Member of Cintra Capital LLC since June 2001. Prior to founding Cintra, he was a Managing Director of The Carlyle Group, a private equity firm that manages over $220 billion, where he headed the firm's U.S. venture capital fund.
- Mr. Reese has served as a Director of The Maids International, a privately held franchisor of cleaning services, since July 2021.
- Previously, Mr. Reese was a Managing Director of Morgan Keegan & Company, where he served on the board of directors and was head of the Mergers and Acquisitions Group, co-head of Investment Banking, and President of the firm's Merchant Banking subsidiary.

- He served as a Director of Oxford Finance Corporation, a privately-held specialty finance company, from 2002 to 2004 and as a Director of Local Vine, LLC, a privately-held retailer, from March 2019 to August 2019.

**EDUCATION**

•Mr. Reese graduated cum laude with a Bachelor of Arts degree from Harvard College and received a Master of Business Administration degree from Harvard Business School.

**QUALIFICATIONS**

We believe that Mr. Reese is well qualified to serve as a director due to his extensive experience in the financial services industry, business leadership and knowledge of financial markets.

**Defendant Ross**

37.     Defendant Ross has served as Ready Capital's President and as a Ready Capital director since October 2016. Defendant Ross is also a co-founder and manager of Defendant Waterfall.

38.     The 2025 Proxy Statement stated the following about Defendant Ross:

**EXPERIENCE**

- Mr. Ross has served as our President and as a member of our board of directors since October 2016. Mr. Ross is a Manager and co-founder of our Manager.
- Mr. Ross also serves as Vice Chairman of the board of directors of Feinstein Institutes for Medical Research, a not-for-profit organization.
- Prior to founding our Manager in January 2005, Mr. Ross was the founder of Licent Capital, a specialty broker/dealer for intellectual property securitization.
- From 1987 until 1999, Mr. Ross was employed by Merrill Lynch where he managed the real estate finance and ABS groups.
- Mr. Ross began his career at Drexel Burnham Lambert where he worked on several of the early ABS transactions and at Laventhol & Horwath where he served as a senior auditor.

**EDUCATION**

- Mr. Ross received a Master of Business Administration degree in Finance with distinction from the University of Pennsylvania's Wharton School of Business and a Bachelor of Science degree in Accounting, cum laude, from the State University of New York at Buffalo.

**QUALIFICATIONS**

Mr. Ross is well qualified to serve as a director due to his significant experience in the securitization market and as a co-founder of our Manager.

**Defendant Sinai**

39.     Defendant Sinai has served as a Ready Capital director since October 2016. Defendant Sinai also serves as the Chairman of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee.

40.     The 2025 Proxy Statement stated the following about Defendant Sinai:

**EXPERIENCE**

- Dr. Sinai is one of our independent directors and has served as a member of our board of directors since October 2016.
- From November 2013 to October 2016 Dr. Sinai served as a member of the board of directors of Sutherland Asset Management Corporation which merged with our Company in October 2016 whereupon Dr. Sinai became a member of our board of directors.
- He is the David B. Ford Professor, Professor of Real Estate and Business Economics and Public Policy at The University of Pennsylvania—The Wharton School, where he has been a member of the faculty since 1997 and the Chairperson of the Real Estate Department since 2019.
- Dr. Sinai has particular expertise in commercial real estate and real estate investment trusts, real estate and public economics, risk and pricing in real estate markets, taxation of real estate and capital gains.

**EDUCATION**

- Dr. Sinai received a Ph.D. in Economics from the Massachusetts Institute of Technology and a Bachelor of Arts degree in Economics and Mathematics from Yale University.

**QUALIFICATIONS**

We believe that Dr. Sinai is well qualified to serve as a director due to his industry technical expertise and knowledge of financial markets.

**Defendant Pyatt**

41.     Defendant Pyatt served as Broadmark's CEO from November 2019 until March 1, 2022. Defendant Pyatt also served as the Chairman of Broadmark's Board from November 2019 until the Merger.

42.     The proxy statement which Broadmark filed on Form 14A with the SEC on April 28, 2022 (the "2022 Broadmark Proxy") stated the following about Defendant Pyatt:

> ***Jeffrey B. Pyatt*** served as our President and Chief Executive Officer and a director from the consummation of the Business Combination. Effective March 1, 2022, Mr. Pyatt resigned from his role as President and Chief Executive Officer of the Company, while continuing in the role of Chairman. Prior to joining the Company, he served as President of MgCo I from the time that he co-founded it in 2010 and served as a member of the board of director of each of the Predecessor Companies from their inception and, directly or indirectly, as a member of the board of managers of each of the Predecessor Management Companies from their inception, in each case through the consummation of the Business Combination. Prior to founding MgCo I, Mr. Pyatt co-founded and managed a private lending fund, Private Lenders Group, from 2004 to 2009. Mr. Pyatt has served on the boards for three different Boys and Girls Clubs as well as numerous other non-profits. Mr. Pyatt received a Bachelor of Science in accounting from the University of Denver and a master's degree in taxation from the University of Denver College of Law.
>
> Mr. Pyatt was selected to serve as a director because of his knowledge regarding the private lending business and experience managing the Predecessor Company Group from its inception and prior experience in private lending, as well as his experience serving as the Chief Executive Officer of the Company.

**Defendant Hermes**

43.     Defendant Hermes served as Broadmark's CFO from November 2022 until the Merger.

**Defendant Luebbers**

44.     Defendant Luebbers served as Broadmark's Interim President from November 2022 until the Merger. Defendant Luebbers also served as a Broadmark director from November 2019 until the Merger. Following the Merger, Defendant Luebbers served as a Ready Capital director from May 31, 2023 until July 2024.

45.    The 2022 Broadmark Proxy stated the following about Defendant Luebbers:

***Kevin M. Luebbers*** has served as a director of the Company since the consummation of the Business Combination. Mr. Luebbers served as a consultant to Trinity Merger Corp. from May 2019 through October 2019, and for Trinity Investments from October 2019 through November 17, 2019. Mr. Luebbers co-founded and has served as managing partner of VIC Partners, LLC, an investment partnership focused on acquiring and repositioning hotel properties, since 2004. Prior to that, he was executive vice president and chief financial officer at RFS Hotel Investors, Inc., a publicly traded real estate investment trust from 2000 to 2003, where he was responsible for the company's capital markets and treasury functions. Prior to that, Mr. Luebbers served as senior vice president of planning and investment analysis at Hilton Hotels Corporation from 1996 to 2000. Mr. Luebbers was a board member and audit committee chairman of Ambassadors International, Inc., a publicly traded cruise, marina and travel and event company, from 2005 to 2008. Mr. Luebbers received a B.S. from Cornell University and an M.B.A. from the University of California at Berkeley.

Mr. Luebbers was selected to serve as a director because of his experience as an executive at a public company in the real estate industry, which included responsibility for financial reporting, as well as his prior experience as a public company director, including prior audit committee experience.

## **Defendant Mayfield**

46.    Defendant Mayfield served as a Broadmark director from 2022 until the Merger.

After the Merger, Defendant Mayfield served as a Ready Capital director from May 31, 2023 until

July 2024.

47.    The 2022 Broadmark Proxy stated the following about Defendant Mayfield:

Pinkie D. Mayfield was appointed to serve as a director effective April 25, 2022. Ms. Mayfield has been Chief Communications Officer and Vice President of Corporate Affairs at Graham Holdings Company (formerly The Washington Post Company), a diversified conglomerate whose principal operations include education and media. In her current role since 2018, Ms. Mayfield is responsible for corporate affairs, public relations, communications and strategic initiatives. Since joining Graham Holdings in 1998, she has held a number of executive leadership positions. Prior to joining Graham Holdings, Ms. Mayfield was a Vice President and Trust Officer at NationsBank (now Bank of America) in the Investment Services Division. A director of Founders Bank, a Washington D.C.-based community bank, she has chaired the audit committee since joining the board in 2020. Ms. Mayfield also serves as the treasurer of the board of directors of the

District of Columbia College Access Program and a trustee of the Philip L. Graham Fund. Ms. Mayfield graduated magna cum laude with a B.A. in business administration from Trinity Washington University and earned an M.B.A. from the University of Maryland University College.

Ms. Mayfield was selected to serve as a director because of her extensive experience in public relations, corporate affairs, communications and investor relations. She is also a seasoned finance and banking executive with experience in multiple sectors, which brings a diverse perspective to the Board.

**Defendant Hirsch**

48.     Defendant Hirsch served as a Broadmark director from 2019 until the Merger. After the Merger, Defendant Hirsch served as a Ready Capital director from May 31, 2023 until July 2024.

49.     The 2022 Broadmark Proxy stated the following about Defendant Hirsch:

***Daniel J. Hirsch*** has served as our director since the consummation of the Business Combination. Mr. Hirsch is the Chief Financial Officer and Chief Operating Officer of Cascade Acquisition Corp (NYSE: CAS), a special purpose acquisition company. Mr. Hirsch served as a consultant to Trinity Investments from January 2019 through November 17, 2019. In addition, Mr. Hirsch served as a consultant to Farallon Capital Management, L.L.C. ("Farallon"), an investment firm that manages capital on behalf of institutions and individuals, for which he has served as a board designee with respect to Farallon's investment in Playa Hotels & Resorts N.V. (NASDAQ: PLYA), from January 2017 to March 31, 2020. Previously, from 2003 to December 2016, Mr. Hirsch held several senior positions at Farallon, including Managing Member of the Real Estate Group from 2009 to December 2016, Managing Director from 2007 to 2008 and Legal Counsel from 2003 to 2006. During his tenure as a director at Playa Hotels & Resorts N.V., Mr. Hirsch served as the chair of the Compensation Committee and a member of the Nominating and Governance Committee. In addition, Mr. Hirsch has served on the board of The Macerich Company (NYSE: MAC) since 2018 and is currently a member of the Compensation Committee and Nominating and Governance Committee. Mr. Hirsch has extensive knowledge of the capital markets and the real estate sector, drawn from several senior positions he held at Farallon between 2003 and 2016, including Managing Member of the Real Estate Group, Managing Director and Legal Counsel. Prior to joining Farallon, Mr. Hirsch worked as an associate in the San Francisco office of the law firm Covington & Burling LLP, from 2001 to 2003. Mr. Hirsch graduated from Yale Law School with a J.D. and earned a Bachelor of Arts degree, summa cum laude, in Law, Jurisprudence and Social Thought from Amherst College.

Mr. Hirsch was selected to serve as a director because of his extensive knowledge of capital markets and the real estate sector gained through leadership experience in the real estate group of a prominent private equity firm and his experience as a public company director, including knowledge of executive compensation through service on the compensation committee of several public companies.

**Defendant Haggerty**

50.    Defendant Haggerty served as a Broadmark director from 2019 until the Merger.

51.    The 2022 Broadmark Proxy stated the following about Defendant Haggerty:

**Stephen G. Haggerty** has served as a director since our formation. Mr. Haggerty is founder and principal of Bare Hill, a multi-strategy real estate investment and advisory platform with a focus on hospitality and wellness related assets. Mr. Haggerty served as a Managing Partner of Trinity Real Estate Investments LLC ("Trinity Investments") from 2018 to October 2021, where he oversaw corporate strategy, leadership and capital markets execution. Before Trinity Investments, Mr. Haggerty was the Global Head of Capital Strategy, Franchising and Select Service at Hyatt Hotels Corporation from 2014 to 2018. In that role, Mr. Haggerty was responsible for implementing Hyatt's overall capital and franchising strategy and overseeing the Select Service business. Prior to assuming that position, Mr. Haggerty was the Executive Vice President, Global Head of Real Estate and Capital Strategy from 2012 to 2014. In that role, Mr. Haggerty was responsible for implementing Hyatt's capital strategy, managing Hyatt's hotel asset base and providing support to the teams of development professionals around the world. Before joining Hyatt Hotels Corporation, Mr. Haggerty spent 13 years serving in several positions of increasing responsibility with Marriott International, Inc., including finance, asset management and development roles in various locations around the world, including Hong Kong and London. Mr. Haggerty was also a board member of Playa Hotels & Resorts from 2012 to 2018, during which Playa Hotel & Resorts became a public company. Mr. Haggerty received a Bachelor of Science from Cornell University.

Mr. Haggerty was selected to serve as a director because of his significant experience in corporate real estate transactions, financial underwriting and prior public company experience as an executive.

**Defendant Karp**

52.    Defendant Karp served as a Broadmark director from 2019 until the Merger.

53.    The 2022 Broadmark Proxy stated the following about Defendant Karp:

***David A. Karp*** has served as our lead independent director since the consummation of the Business Combination. Mr. Karp is a 36-year veteran in real estate investment finance and management. He was most recently Executive Vice President and Chief Financial Officer of Empire State Realty Trust, Inc. (NYSE: ESRT), a real estate investment trust that owns and operates office and retail properties in Manhattan and the greater New York metropolitan area, including the Empire State Building. Mr. Karp joined ESRT's predecessor in 2011 and was responsible for finance, capital markets, accounting, and investor relations. Prior to that, Mr. Karp served as Managing Director and Chief Financial Officer of Forum Partners Investment Management LLC from 2006 to 2011 and Chief Operating Officer from 2009 to 2011, where he was responsible for both firm-level and fund-level financial management and strategy. From 1996 to 2005, Mr. Karp served as President, Chief Operating Officer and Chief Financial Officer of Falcon Financial Investment Trust, which he co-founded. Mr. Karp has an MBA in Finance and Real Estate from the Wharton School of the University of Pennsylvania and a B.A., summa cum laude, in Economics from the University of California at Berkeley.

Mr. Karp was selected to serve as a director because of his extensive experience in real estate investment finance and prior executive experience, including overseeing financial reporting at a REIT.

## Defendant Lawrence

54.    Defendant Lawrence served as a Broadmark director from 2019 until the Merger.

55.    The 2022 Broadmark Proxy stated the following about Defendant Lawrence:

***Norma J. Lawrence*** has served as a director since the consummation of the Business Combination. Ms. Lawrence currently serves on the board of directors of Marcus & Millichap Inc. (NYSE: MMI), a brokerage company providing real estate investment brokerage, financing and advisory services. Previously, Ms. Lawrence was a Partner at KPMG, LLP, where she was employed from 1979 to 2012 and provided extensive accounting and auditing services to companies in the real estate and hospitality industries. Ms. Lawrence is currently a member of WomenCorporateDirectors and was a member of the National Association of Real Estate Investment Trusts, the Pension Real Estate Association, the National Council of Real Estate Investment Fiduciaries, the California Society of Certified Public Accountants, and the American Institute of Certified Public Accountants. Ms. Lawrence received a B.A. in mathematics and an M.B.A. in finance and accounting from the University of California, Los Angeles.

Ms. Lawrence was selected to serve as a director because of her extensive accounting and auditing experience, particularly for companies in the real estate industry.

## Defendant Filipps

56.    Defendant Filipps served as a Ready Capital company director from 2016 until July 2024.

57.    The proxy statement Ready Capital filed on Form 14A with the SEC on July 3, 2023 (the "2023 Ready Capital Proxy") stated the following about Defendant Filipps:

EXPERIENCE

● Mr. Filipps is one of our independent directors and has served as a member of our board of directors since October 2016. From November 2013 to October 2016 Mr. Filipps served as a member of the board of directors of Sutherland Asset Management Corporation which merged with our Company in October 2016 whereupon Mr. Filipps became a member of our board of directors.
● He has served since 1995 as a director and chairman of the audit committee of Impac Mortgage Holdings, Inc. (NYSE: IMH) and has served since February 2013 as a director of Orchid Island Capital Corp (NYSE: ORC). From March 2002 to December 2014, Mr. Filipps was a director of Primus Guaranty Limited (NYSE: PRS) and from 2010 to December 2014 he was a director, member of the audit committee and chairman of the compensation committee of Fortegra Financial (NYSE: FRF).
● From April 2005 to July 2008, Mr. Filipps was Chairman and Chief Executive Officer of Clayton Holdings, Inc.
● From 1995 to 2005, Mr. Filipps was Chairman, Chief Executive Officer and a Director of Radian Group Inc. Mr. Filipps began his career at Radian in 1992 as Senior Vice President and Chief Financial Officer. In 1994, he was promoted to Executive Vice President and Chief Operating Officer and in 1995 he was named President, Chief Executive Officer and Director.
● From 1975 to 1992, Mr. Filipps was at American International Group where he served in a number of executive, financial and investment management positions.

EDUCATION

● Mr. Filipps holds a Master of Business Administration degree in corporate finance and international business from the Stern School of Business at New York University and a Bachelor of Arts degree in Economics from Rutgers University.

QUALIFICATIONS

We believe that Mr. Filipps is well qualified to serve as a director due to his experience in public and private company governance and his financial experience and knowledge.

**Defendant Petro**

25

58.    Defendant Petro served as a Ready Capital director from 2016 until July 2024.

59.    The 2023 Ready Capital Proxy stated the following about Defendant Petro:

EXPERIENCE

● Ms. Petro has served as a member of our board of directors since 2021.
● From March 2020 through February 2023, Ms. Petro was engaged by our Manager as a consultant providing advice in the commercial finance and consumer finance sectors, as well as support for Ready Capital marketing initiatives and SBA business development.
● She served as Managing Director and Group Head of the Specialty Commercial Finance Group of our Manager from June 2018 until February 2020.
● Ms. Petro previously worked at Wells Fargo Capital Finance from 2000 to 2017 as the Executive Vice President and Group Head of the Lender Finance Division and the Supply Chain Finance Division.
● From 1992 to 2000, Ms. Petro was at Transamerica Business Credit where she served as the Senior Vice President and National Marketing Manager.
● Ms. Petro currently serves as a member of the MS Finance Advisory Board of the McCombs School of Business at The University of Texas and as a member of the board of directors of the Secured Finance Network (formerly known as the Commercial Finance Association ("CFA")).
● She also served as President of the CFA from 2016 to 2017 and currently serves as a member of the board of directors of the Secured Finance Network Education Foundation.

EDUCATION

● Ms. Petro holds a Master of Business Administration degree in finance from the McCombs School of Business at the University of Texas and a Bachelor of Arts degree with a concentration in Russian and Soviet Studies from Kent State University.

QUALIFICATIONS

We believe that Ms. Petro is well qualified to serve as a director due to her extensive experience in commercial finance sectors.

**Defendant Waterfall**

60.    Defendant Waterfall is the external asset manager for Ready Capital. Defendant Waterfall also employed several members of Ready Capital's executive management team and thus controlled the contents of the Joint Proxy.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

61.     By reason of their positions as officers, directors, and/or fiduciaries of Broadmark, and because of their ability to control the business and corporate affairs of Broadmark, the Individual Defendants owed Broadmark and their respective shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Broadmark in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Broadmark and its shareholders so as to benefit all shareholders equally.

62.     Each director and officer of the Company owes to Broadmark and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

63.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Broadmark, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

64.     To discharge their duties, the officers and directors of Broadmark were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the respective company they served.

65.     Each of the Individual Defendants, by virtue of their position as a director and/or officer, owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Broadmark, the absence of good faith on

their part, or a reckless disregard for their duties to the Company and their respective shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and directors of the Company, has been ratified by the remaining Individual Defendants who collectively comprised a majority of Broadmark's Board at all relevant times.

66.     As senior executive officers and/or directors of publicly-traded companies whose common stocks were registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's respective business, prospects, and operations, and had a duty to cause the Company to disclose in their regulatory filings with the SEC all those facts described in this Complaint that they failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

67.     To discharge their duties, the officers and directors of Broadmark were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Broadmark were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Washington, Maryland, New York, and the United

States, and pursuant to Broadmark's own Code of Business Conduct and Ethics (the "Code of Ethics");

(b)    conduct the affairs of the Company in an efficient, business-like manner to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Broadmark conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Broadmark and procedures for the reporting of the business and internal affairs to the respective boards and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Broadmark's operations would comply with all applicable laws and Broadmark's financial statements and regulatory filings filed with the SEC and disseminated to the public and the shareholders of Broadmark would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by Broadmark's officers and employees and any other reports or information that the Company were required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

68.    Each of the Individual Defendants further owed to Broadmark and their respective shareholders the duty of loyalty requiring that each favor Broadmark's interest and that of their respective shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

69.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Broadmark and were at all times acting within the course and scope of such agency.

70.    Because of their advisory, executive, managerial, directorial, and controlling positions with Broadmark, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

71.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Broadmark.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

72.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

73.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate Broadmark's stock price.

74.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Broadmark Board, each of the Broadmark Individual Defendants who is a director of Broadmark was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

75.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

76.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Broadmark and was at all times acting within the course and scope of such agency.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

#### *Ready Capital's Structure and Business*

77.    Ready Capital is a real estate finance company in the primary business of lending. Ready Capital offers a variety of real estate-related investments including but not limited to LMM, CRE and SBC loans for use in developing multifamily residential properties, with principals typically ranging up to $40 million, according to the Company. Ready Capital's originated SBC loans are those which it originates itself and are generally held for investment through the maturity of the loans. Ready Capital's acquired SBC loans are those which it purchases from third parties and typically include non-performing loans at a discount to their unpaid principal balance. Ready Capital employs various borrower-based strategies to attempt to extract value from such loans.

78.    Ready Capital is an REIT and is thus required by the Internal Revenue Code to annually distribute a minimum of 90% of its net taxable income through dividends. This means that Ready Capital's stock value depends enormously on the amount of the dividend it pays in addition to the value of underlying real estate assets generating such value.

79.    Ready Capital is managed and advised externally by Defendant Waterfall, which sets and directs Ready Capital's investment strategy and identifies loan acquisition and origination opportunities on behalf of Ready Capital. Indeed, pursuant to a management agreement, Defendant Waterfall, founded by Defendants Capasse and Ross, provides Ready Capital with its CEO, CFO, Chief Operating Officer ("COO"), CIO, and Chief Credit Officer ("CCO"). In consideration for

these services, Ready Capital pays Waterfall a quarterly fee in arrears equal to 1.5% per annum of Ready Capital's stockholders' equity up to $500 million and 1.0% per annum above $500 million.

80.    When reporting its earnings, Ready Capital evaluates its performance in part through a financial metric it calls "Distributable Earnings." Ready Capital uses this metric to "evaluate [its] performance and determine [its] dividends," and it determines this metric by excluding, among other things, any unrealized provisions for expected losses on its loan portfolio from Net Income (as defined by Generally Accepted Accounting Principles ("GAAP")). Thus, an increase to expected credit losses that may result from rising delinquencies and/or defaults negatively impacts reported Distributable Earnings for a given period.

### Ready Capital Acquires Mosaic

81.    During the 2021 and 2022 fiscal years, Ready Capital substantially increased its origination of SBC loans. Indeed, Defendant Capasse reported during a February 2022 earnings call that during the fourth quarter of fiscal year 2021, Ready Capital had "originated a record $2.2 billion" worth of SBC loans, which he claimed "exceeded total annual production in both 2020 and 2019." This massive spike in origination continued into the subsequent quarter, when, during Ready Capital's first quarter earnings call, Defendant Capasse stated that Ready Capital's SBC segment remained "at record levels with over $2.2 billion originated." The overwhelming majority of this consisted of loans collateralized by multifamily residential properties. By fiscal year 2022's end, the combined carrying value of loans originated in 2021 and 2022 was approximately $7 billion, accounting for over 70% of Ready Capital's almost $10 billion loan portfolio.

82.    On November 4, 2021, Ready Capital announced in a press release that it had agreed to acquire Mosaic in a stock-for-stock merger valued at approximately $470 million (the "Mosaic Merger"). As part of this acquisition, Ready Capital agreed to purchase Mosaic's existing

loan portfolio, which Ready Capital purported consisted of thirty-two loans with a cumulative outstanding balance of $565 million. During a conference call held the following day, November 5, 2021, the Company's CCO, Adam Zausmer, stated that this loan portfolio had a "strong" credit profile with "good" geographic diversity, and that it was concentrated in the country's "most liquid" markets, further stating, in relevant part, that:

> So the overall credit profile of this portfolio is strong. We have a healthy basis in the loan portfolio. Moderate weighted average as is LTV is based on fresh valuations that we ordered through our due diligence process. The portfolio has a good property type and geographic diversity, approximately 95% of assets are in what we call geo tiers 1 through 3, which are the largest and most liquid assets, excuse most liquid markets across the country. Approximately 25% of the portfolio is backed by multifamily properties, which obviously is a lower volatile asset class that we're very, excuse me, bullish on. Majority of the construction projects are well into construction phase with guaranteed maximum price contracts. This mitigates rising construction costs that the market is experiencing due to materials and labor shortages and then also supply chain issues.

> In terms of a breakdown of the portfolio, construction represents about 60% of the assets. I'd say from a geographic perspective, about 40% of the assets are on the West Coast markets that we – like Los Angeles, et cetera. From a credit performance perspective, the performance through the pandemic has been positive with over 90% of the portfolio fully performing today. 2 assets are in default, and there are 3 REO assets. 2 of the REOs were due to the pandemic, and there was 1 legacy REO. 3 to 4 assets have experienced a lead due to the pandemic, which is material supply shortage and our cost overruns. But we're comfortable with the assets due to the projects being backed by reputable, well-capitalized developers and sponsors who during the pandemic contributed additional equity as needed and had executed completion interest in carry guarantees at closing of the deals. There's 6 deals that received extensions since the onset of the pandemic, and want to highlight that 6 deals have been repaid at par since the beginning of our due diligence process, which is extremely favorable.

83.    Ready Capital announced just over four months later, on March 16, 2022, that the Mosaic Merger was complete.

### The Ritz-Carlton Calamity

84.    One of Ready Capital's acquisitions from the Mosaic Merger was a mixed-use asset: a Ritz-Carlton hotel located in Portland, Oregon with hospitality, office space, and residential

components, consisting of a $504 million senior loan and a $62 million equity position (the "Ritz-Carlton"). Though undisclosed to investors before or during the Mosaic Merger or Merger, this project faced numerous, massive setbacks early on. Indeed, a lawsuit filed on March 19, 2025, shortly after the Relevant Period's conclusion, by Broadway EB-5 Fund, LLC, a mezzanine lender in the Ritz-Carlton development project, seeks to enjoin, *inter alia*, the transfer of the property from the development entities to Ready Capital, BRMK Lending SPE JP, LLC, or Sutherland Asset I, LLC (each indirect subsidiaries or affiliates of Ready Capital).

85.    According to Ready Capital's own filings in that action, the Ritz-Carlton project faced massive challenges from the commencement of construction in 2019. These setbacks seriously negatively impacted its value. A sworn affirmation of Alex Ovalle ("Ovalle"), a Managing Director and Head of Construction Lending and Syndications at Ready Capital, stated that the project "*faced catastrophic setbacks from the beginning*," which "*impeded the Project's development*," and had caused the project to "*cost far more than originally contemplated*." Ovalle continued, stating the following, in relevant part:

**The Project Encounters Catastrophic Setbacks from the Beginning**

. . . Construction on the Project began in late 2019 and Senior Lender began advancing funds to the Senior Borrowers consistent with the terms of the CLA.

. . . Shortly thereafter, the Project encountered numerous and substantial delays. Mr. Sher refers to these, in passing, as "certain delays and cost overruns." Sher Aff. ¶28. In fact, the Project faced catastrophic setbacks from the beginning. As construction on the Project was commencing, the COVID-19 pandemic erupted and halted progress on the construction. Certain COVID-19 restrictions remained in place for the next several years, which exacerbated construction delays and the Project's financial difficulties. Moreover, during this same time, downtown Portland, where the Project is located, was beset by significant civil unrest. Protests, demonstrations, looting, and vandalism plagued downtown, and further impeded the Project's development. In addition, a water leak caused substantial damage. As a result, the Project cost far more to construct than originally contemplated and the value, upon completion of construction, was far less than projected. In consequence, deadlines and obligations relating to both the Senior Loan and

Mezzanine Loan were amended and extended to provide additional time to finance and complete the Project.

. . . These unprecedented events forced the parties to reevaluate both their original funding plan and the expected timeframes to complete the Project.

86.    Ovalle's affirmation further stated that by "March 2023" (only two months before the Merger) the project had "insufficient funds allocated to [its] construction budget" because of increased construction costs and the developer's failure to make the equity contributions necessary to cover said funding deficit.

### *Ready Capital Acquires Broadmark*

87.    Just under a year after the Mosaic Merger, Ready Capital and Broadmark issued a joint press release on February 27, 2023 to announce their proposal for the Merger. Under the terms of the proposed agreement, Ready Capital would issue over sixty million shares of Ready Capital common stock to Broadmark's shareholders—an implied consideration of approximately $787 million. Broadmark shareholders were expected to own approximately 36% of the combined company's stock upon closing of the Merger, and Ready Capital was to assume Broadmark's outstanding senior unsecured notes.

88.    In connection with the acquisition announcement, Broadmark issued a presentation deck to emphasize the purported upsides of Merger. This deck claimed the Merger would yield "significant value creation for shareholders via both economic and operational leverage," in part because of the combined company's ostensibly "[l]arger [e]quity [b]ase." Furthermore, the deck represented that the Merger was "[s]trategically & [f]inancially [c]ompelling," insofar as, *inter alia*, it would provide Broadmark's shareholders a "higher and more consistent dividend," in addition to "attractive risk-adjusted yields," and "more attractive [price to tangible book value] multiples." The deck thus proclaimed the Merger was "[h]ighly [s]ynergistic" and would "enhance

growth and returns across macro and rate cycles," because of the "[c]ombined focus" on construction and bridge loans in "top markets to strong sponsors."

89.     On May 30, 2023, Ready Capital and Broadmark shareholders voted to approve the Merger based on the Joint Proxy. The following day, May 31, 2023, Ready Capital announced the Merger's close and issued over sixty million shares of Ready Capital common stock to Broadmark shareholders, with said stock closing at $10.11 per share on its first day of trading (i.e., May 31, 2023).

90.     Management fees paid to Defendant Waterfall materially increased between fiscal year 2022 and fiscal year 2023. After the Mosaic Merger in fiscal 2022, Defendant Waterfall's management fees grew from $11 million in 2021 to $19 million in 2022. Similarly, in fiscal 2023, following the Merger's completion, Defendant Waterfall's management fees increased again to $25 million. Several of the Individual Defendants, including Defendants Capasse, Ahlborn, and Ross, had direct pecuniary interests in Defendant Waterfall at the time of the Merger's completion, and thus directly benefitted from the increased management fees Ready Capital paid Defendant Waterfall as a result. The possibility of such interests was suggested in the Joint Proxy, which stated, in relevant part:

> Following the Merger, Ready Capital stockholders' equity will include the additional equity attributable to the acquisition of Broadmark, and, thus, the amount of the management fees payable to [Waterfall] will also increase, which gives [Waterfall] (and, therefore, Ready Capital's management) an incentive, not shared by Ready Capital stockholders, to negotiate and effect the Merger, possibly on terms less favorable to Ready capital than would otherwise have been achieved.

91.     Similarly, Broadmark officers and directors had interests in consummating the Merger that their own stockholders did not share. The Joint Proxy made clear that "Broadmark stockholders should be aware that the directors and executive officers of Broadmark have interests in the Merger that may be different from, or in addition to, the interests of Broadmark stockholders

generally and that may present actual or potential conflicts of interests." These interests, it so happens, included millions of dollars of Broadmark equity awards that became converted to Ready Capital equity because of the Merger, as well as severance benefits and "golden parachute" payments to certain Broadmark officers.

### *Ready Capital Approves a New Equity Incentive Plan*

92.    Defendants Capasse, Ross, Reese, Marshall, Mielle, Nathan, Sinai, Petro, Ahlborn, Luebbers, Hirsch, and Mayfield solicited the 2023 Ready Capital Proxy pursuant to Section 14(a) of the Exchange Act. The 2023 Ready Capital Proxy asked Ready Capital shareholders to, *inter alia*: (1) vote to elect new directors to the Ready Capital Board until the 2024 shareholders meeting; (2) ratify the appointment of Deloitte & Touche LLP as Ready Capital's independent registered public accounting firm; (3) approve on an advisory basis the compensation of Ready Capital's named executive officers; and (4) approve and adopt the Ready Capital Corporation 2023 Equity Incentive Plan ("the 2023 Incentive Plan").

93.    The 2023 Ready Capital Proxy stated that, were shareholders to approve 2023 Incentive Plan, it would replace the previous incentive plan, which was set to expire on November 25, 2023. The 2023 Incentive Plan, expiring August 22, 2033, "provides for grants of stock options, restricted shares of Common Stock, restricted stock units, dividend equivalent rights, restricted limited partnership units issued by [Ready Capital's] operating partnership and other equity-based awards." Under the 2023 Incentive Plan, awards may be granted to Ready Capital's "Manager and other persons who provide services to the Company as directors, officers, employees, advisors, consultants and other third-party service providers," including "employees of the Manager and its affiliates who are providing services to [Ready Capital and its] affiliates."

94.    Defendants Ahlborn, Hirsch, Luebbers, Marshall, Filipps, Mayfield, Mielle, Nathan, Petro, Reese, and Sinai received handsome compensation in the form of equity awards pursuant to the 2023 Incentive Plan after its solicitation, and after the prior solicitation of the materially false and misleading Joint Proxy. Shareholders would not have approved the 2023 Ready Capital Proxy's proposals, including the 2023 Incentive Plan, had they been made aware of the truth about Ready Capital's portfolio, which would not begin to emerge until 2024.

***Weaknesses Begin to Appear in Ready Capital's Portfolio***

95.    Following the Merger's close, Ready Capital's legacy SBC loan portfolio began showing significant signs of deterioration and material weakness, as exemplified by Ready Capital's subsequent engagement in hundreds of millions of dollars' worth of loan modifications— a significant departure from Ready Capital's historical behavior. Unfortunately for the Company's shareholders, this was not to remain a singular anomaly.

96.    Indeed, on August 7, 2024, Ready Capital announced its earnings for the second fiscal quarter of 2024. During the earnings call, held the following day, August 8, 2024, Defendant Capasse stated that 60-day and greater delinquencies within Ready Capital's originated portfolio had improved from 7.9% in the prior quarter to 5.2%. Defendant Capasse attributed this growth in part to Ready Capital's loan modification initiatives. Defendant Ahlborn similarly touted that a "majority" of the Company's improvements in delinquency rates was "driven by modifications and natural improvement in credit." According to Defendant Capasse, at this time, Ready Capital had granted modifications to twenty-five loans within its originated portfolio totaling $800 million, with 82% thereof completed in the second quarter of 2024 alone.

97.    On August 9, 2024, Ready Capital filed its quarterly report with the SEC on Form 10-Q (the "Q2 2024 10-Q"). The Q2 2024 10-Q revealed previously undisclosed distress in Ready

Capital's originated portfolio, including the fact that in the six months ended June 30, 2024, approximately $28.5 million of Ready Capital's interest income had been "paid-in-kind" ("PIK"). PIK interest income indicates that Ready Capital had increased certain borrowers' debt by the amount of interest due and then recognized that amount as income, instead of collecting cash interest payments from those borrowers. Increases in interest PIK for loans generally indicates heightened financial stress and degraded loan quality within the portfolio. The Q2 2024 10-Q also reported that Ready Capital's quarterly Distributable Earnings had declined approximately **67% year-over-year**, from $51 million in the quarter immediately following the Merger all the way down to $16.6 million. *Barron's* published an article on September 12, 2024, regarding this earnings release, emphasizing that PIK interest in the second quarter was $14.7 million, meaning that approximately *88.6% of Ready Capital's income for the quarter was non-cash income accrued from distressed borrowers*.

98.    On November 7, 2024, Ready Capital announced its financial results for 2024's third quarter. During the November 8, 2024 earnings call, Defendant Ahlborn, in response to an analyst question regarding Ready Capitals third quarter PIK interest, stated that "a little over 20%" of Ready Capital's reported $226 million in interest income was PIK or accrued. This implied that approximately $45 million of Ready Capital's revenues for the quarter consisted of non-cash accruals. Defendant Ahlborn continued, stating that roughly half of Ready Capital's PIK interest stemmed from construction assets acquired in the Mosaic Merger, with the balance stemming from the modified loans Ready Capital had previously provided. Thus, Defendant Ahlborn made clear, roughly 74% of the Mosaic assets generating PIK interests were "expected to be repaid at the end of next year."

99.    The full truth about Ready Capital's undisclosed material financial weaknesses would emerge less than a year later, when Ready Capital issued a press release regarding its fourth quarter and full year 2024 financial results (the "Q4 2024 Press Release") on March 3, 2025 (as discussed in further detail below.

## FALSE AND MISLEADING STATEMENTS

### April 20, 2023: the Joint Proxy

100.    The Relevant Period begins on April 20, 2023, when the Company filed the Joint Proxy with the SEC. The Joint Proxy was negligently prepared, consequently containing numerous untrue statements of material fact and omissions of material facts required to make the statements within the Joint Proxy not misleading. The Joint Proxy urged Broadmark shareholders to vote to support of the Merger and was signed by Defendants Capasse, Ahlborn, Ross, Filipps, Marshall, Mielle, Nathan, Petro, Reese, and Sinai.

101.    In highlighting the Merger's purported benefits, the Joint Proxy represented that the combined company would have "[a]ligned [s]trategies" that were purportedly focused upon construction and bridge loans in "attractive markets to strong sponsors." The Joint Proxy further highlighted the Merger's potential "value creation" for Broadmark shareholders, stating that they would be able to "participate in the long-term upside of the Combined Company." Part of this upside, according to the Joint Proxy, was the "[p]otential for [i]ncreased [m]ultiples and [d]ividend[s]" as a result of the Merger and the better "economic and operational" leverage the combined company would supposedly enjoy. This, the Joint Proxy emphasized, would ostensibly create an "opportunity" for a "higher and more consistent dividend," as well as an "improved price to tangible book value and earning multiples." Importantly, the Joint Proxy provided financial

projections related to Ready Capital's profits, dividend, and assets, stating the following, in relevant part:

| | 2023E | 2024E | 2025E | 2026E |
|---|---|---|---|---|
| Distributable Earnings Per Share[1] | $ 1.60 | $ 1.60 | $ 1.60 | $ 1.60 |
| Dividends Per Share | $ 1.60 | $ 1.60 | $ 1.60 | $ 1.60 |
| Book Value Per Share | $15.15 | $15.10 | $15.05 | $14.99 |

102.    Furthermore, the Joint Proxy emphasized Ready Capital's alleged "experience" in "underwriting and managing" commercial real estate loans, representing that Ready Capital was able to deploy funds to assets "with the most attractive risk-adjusted returns." The Joint Proxy stated, with respect to this point, that:

> Ready Capital's investment strategy is to opportunistically expand its market presence in its acquisition and origination segments and further grow its SBC securitization capabilities which serve as a source of attractively priced, match-term financing. Capitalizing on its experience in underwriting and managing commercial real estate loans, Ready Capital has grown its SBC and SBA origination and acquisition capabilities and selectively complimented its SBC strategy with residential agency mortgage originations. As such, Ready Capital has become a full-service real estate finance platform and Ready Capital believes that the breadth of its business allows for adaptation to changing market conditions and the deployment of capital in asset classes with the most attractive risk-adjusted returns.

103.    The Joint Proxy also represented that Ready Capital was a multi-strategy real estate finance company that focused upon SBC loans which ranged "up to $40 million" in original principal amounts. In relevant part, the Joint Proxy stated the following:

> We are a multi-strategy real estate finance company that originates, acquires, finances, and services SBC loans, SBA loans, residential mortgage loans, construction loans, and to a lesser extent, MBS collateralized primarily by SBC loans, or other real estate-related investments. Our loans range in original principal amounts generally up to $40 million and are used by businesses to purchase real estate used in their operations or by investors seeking to acquire multi-family, office, retail, mixed use or warehouse properties. Our objective is to provide attractive risk-adjusted returns to our stockholders, primarily through dividends as well as through capital appreciation. In order to achieve this objective, we continue to grow our investment portfolio and believe that the breadth of our full-service real

estate finance platform will allow us to adapt to market conditions and deploy capital to asset classes and segments with the most attractive risk-adjusted returns.

104.    The Joint Proxy continued, stating that Ready Capital maintained an "allowance for credit losses," to account for "losses on loans and lending commitments." The Joint Proxy represented that such were "reviewed quarterly" and evaluated based upon "credit quality indicators, including probable and historic losses, collateral values, LTV ratio and economic conditions." Elaborating on these practices, the Joint Proxy also claimed that Ready Capital's allowance for credit losses was based in part on an "expected loss model known as the [CECL] model," which estimated expected losses based not only on "historical experience and current conditions, but also by including reasonable and supportable forecasts incorporating forward-looking information."

105.    Moreover, in explaining Ready Capital's implementation of the CECL model, the Joint Proxy represented that Ready Capital estimated CECL for its loan portfolio "at the individual loan level," based on various "key loan-specific inputs," among other things. The Joint Proxy continued, stating, in relevant part:

> We implemented loan loss forecasting models for estimating expected life-time credit losses, at the individual loan level, for its loan portfolio. The CECL forecasting methods used by the Company include (i) a probability of default and loss given default method using underlying third-party CMBS/CRE loan database with historical loan losses and (ii) probability weighted expected cash flow method, depending on the type of loan and the availability of relevant historical market loan loss data. We might use other acceptable alternative approaches in the future depending on, among other factors, the type of loan, underlying collateral, and availability of relevant historical market loan loss data.

> We estimate the CECL expected credit losses for our loan portfolio at the individual loan level. Significant inputs to our forecasting methods include (i) key loan-specific inputs such as LTV, vintage year, loan-term, underlying property type, occupancy, geographic location, and others, and (ii) a macro-economic forecast. These estimates may change in future periods based on available future macro-economic data and might result in a material change in our future estimates of expected credit losses for its loan portfolio.

106.    Additionally, the Joint Proxy stated Ready Capital used "relevant loan-specific qualitative factors" to estimate CECL in some circumstances, stating, in relevant part, that:

> In certain instances, we consider relevant loan-specific qualitative factors to certain loans to estimate its CECL expected credit losses. We consider loan investments that are both (i) expected to be substantially repaid through the operation or sale of the underlying collateral, and (ii) for which the borrower is experiencing financial difficulty, to be "collateral-dependent" loans. For such loans that we determine that foreclosure of the collateral is probable, we measure the expected losses based on the difference between the fair value of the collateral (less costs to sell the asset if repayment is expected through the sale of the collateral) and the amortized cost basis of the loan as of the measurement date. For collateral-dependent loans that we determine foreclosure is not probable, we apply a practical expedient to estimate expected losses using the difference between the collateral's fair value (less costs to sell the asset if repayment is expected through the sale of the collateral) and the amortized cost basis of the loan.

107.    In describing the Mosaic Merger, the Joint Proxy characterized it as the acquisition of "real estate structured finance opportunities funds, with a focus on construction lending." The Joint Proxy also described the Mosaic Merger as an opportunity which had "further expanded the Company's investment portfolio and origination platform to include a diverse portfolio of construction assets with attractive portfolio yields."

108.    Similarly, the Joint Proxy represented that the acquired SBC loans, which included all the loans acquired in the Mosaic Merger, had an unpaid principal balance "of $2.0 billion and a carrying value of $2.0 billion as of December 31, 2022." Regarding Ready Capital's "[o]riginated SBC loans," the Joint Proxy stated that Ready Capital's portfolio had an unpaid principal balance "of $7.6 billion and a carrying value of $7.5 billion as of December 31, 2022." The Joint Proxy stated that all such loans were in fact "substantially" performing loans.

109.    The statements described in ¶¶ 100-108 above were materially false and/or misleading when made because they failed to disclose and/or misrepresented, *inter alia*, that: (1) a material portion of borrowers within Ready Capital's originated portfolio were experiencing

significant financial distress due to high interest rates that had increased their borrowing costs; (2) an oversupply of multifamily properties in Ready Capital's markets had severely limited its borrowers' ability to raise their rents sufficiently to cover their growing debt costs; (3) a major development project acquired in the Mosaic Merger (the Ritz-Carlton), accounting for approximately $500 million of Ready Capital's acquired loan portfolio, had experienced catastrophic setbacks since its inception, including significant cost overruns, construction delays, and funding shortfalls; (4) that, as a result of (1)–(3) above, Ready Capital's CECL reserves and expected credit losses were materially understated; and (5) that, as a result of (1)–(4) above, Ready Capital's financial projections regarding Ready Capital's Distributable Earnings per share, dividends per share, and book value per share had no basis in fact when made.

110.    Indeed, the Joint Proxy failed to disclose, *inter alia*, that: (1) a material portion of borrowers within Ready Capital's originated portfolio were experiencing significant financial distress due to high interest rates that had increased their borrowing costs; or (2) a major development project acquired in the Mosaic Merger (the Ritz-Carlton), accounting for approximately $500 million of Ready Capital's acquired loan portfolio, had experienced catastrophic setbacks since its inception, including significant cost overruns, construction delays, and funding shortfalls. These facts, undisclosed to investors, were known to the Individual Defendants and would (and ultimately did) have a negative impact on Ready Capital's CECL reserves, distributable earnings, and net book value, thus damaging Broadmark shareholders who received Ready Capital stock following the closing of the Merger.

111.    In fact, the risk factors that *were* provided by the Joint Proxy were materially misleading. They provided generic statements of potential or contingent risk and failed to disclose that the potential future adverse impacts described thereby were in fact already occurring. A salient

example of this is the Joint Proxy's statement that "[d]ifficult conditions in the mortgage, residential and commercial real estate markets, or in the financial markets and the economy generally, including market volatility, inflation, the outbreak of COVID-19 and the emergency and severity of variants *may* cause us to experience market losses related to our holdings." Indeed, despite these positive representations, in reality the Company had failed to disclose that a material number of Ready Capital's borrowers were already experiencing significant financial distress and thus were negatively impacting Ready Capital's CECL reserves and expected credit losses *at the time of the Merger*.

### *2023 Ready Capital Proxy*

112.    On July 3, 2023, the Company filed the 2023 Ready Capital Proxy, which contained material misstatements and omissions, with the SEC pursuant to Section 14(a) of the Exchange Act. The 2023 Ready Capital Proxy asked shareholders to vote to, *inter alia*: (1) elect twelve directors to serve on the Ready Capital Board; (2) ratify the appointment of Deloitte & Touche LLP as the independent registered public accountant for Ready Capital's 2023 fiscal year; (3) approve on an advisory basis the compensation of Ready Capital's named executive officers; and (4) approve and adopt the "Ready Capital Corporation 2023 Equity Incentive Plan."

113.    In a section titled "Role of Our Board and Risk Oversight," the 2023 Ready Capital Proxy stated the following about the Board's risk oversight responsibilities, in relevant part:

> Pursuant to our charter and Bylaws, our business and affairs are managed under the direction of our board of directors. Our board of directors has the responsibility for establishing broad corporate policies and for our overall performance and direction but is not involved in our day-to-day operations. Members of our board of directors keep informed of our business by participating in meetings of our board of directors and its committees, by reviewing analyses, reports and other materials provided to them and through discussions with our Manager and our executive officers.
>
> In connection with their oversight of risk to our business, our board of directors and the Audit Committee consider feedback from our Manager concerning the risks

related to our business, operations, and strategies. The Audit Committee discusses and reviews policies with respect to our risk assessment and risk management, including guidelines and policies to govern the process by which risk assessment and risk management is undertaken, the adequacy of our insurance coverage, our interest rate risk management, our counterparty and credit risks, our capital availability, and refinancing risks. Our Manager regularly reports to our board of directors on our leverage policies, our asset origination and acquisition processes, any asset impairments, and our qualification as a REIT and whether we remain excluded from registration as an investment company under the Investment Company Act of 1940, as amended. Members of our board of directors routinely meet with our Manager and our executive officers, as appropriate, in connection with their consideration of matters submitted for the approval of our board of directors and the risks associated with such matters.

Our board of directors believes that its composition protects stockholder interests and provides sufficient independent oversight of our Manager. A majority of our current directors are "independent" under NYSE standards, as more fully described elsewhere in this Proxy Statement. The independent directors meet separately from the personnel of our Manager on at least a quarterly basis and are very active in the oversight of our Company. The independent directors oversee such critical matters as the integrity of our financial statements, the evaluation and compensation of our Manager and the selection and evaluation of directors.

114.    Defendants Capasse, Ross, Reese, Marshall, Mielle, Nathan, Sinai, Ahlborn, Petro, Luebbers, Hirsch, and Mayfield caused the 2023 Ready Capital Proxy to be false and misleading at the time of issuance because it failed to disclose, *inter alia,* that: (1) a material portion of borrowers within Ready Capital's originated portfolio were experiencing significant financial distress due to high interest rates that had increased their borrowing costs; (2) an oversupply of multifamily properties in Ready Capital's markets had severely limited its borrowers' ability to raise their rents sufficiently to cover their growing debt costs; (3) a major development project acquired in the Mosaic Merger (the Ritz-Carlton), accounting for approximately $500 million of Ready Capital's acquired loan portfolio, had experienced catastrophic setbacks since its inception, including significant cost overruns, construction delays, and funding shortfalls; (4) that, as a result of (1)–(3) above, Ready Capital's CECL reserves and expected credit losses were materially

understated; and (5) that, as a result of (1)–(4) above, Ready Capital's financial projections regarding Ready Capital's Distributable Earnings per share, dividends per share, and book value per share had no basis in fact when made.

115.    As a result of Defendants Capasse, Ross, Reese, Marshall, Mielle, Nathan, Sinai, Ahlborn, Petro, Luebbers, Hirsch, and Mayfield causing the 2023 Ready Capital Proxy to be false and misleading, Ready Capital shareholders voted, *inter alia* to: (1) reelect the Ready Capital Individual Defendants to the Board; (2) ratify the appointment of Deloitte & Touche LLP as the Company's registered independent public accounting firm for the fiscal year 2023; (3) approve on an advisory basis the compensation of Ready Capital's named executive officers; and (4) approve and adopt the "Ready Capital Corporation 2023 Equity Incentive Plan."

### *2024 Ready Capital Proxy*

130.    On June 14, 2024, the Company filed on Form DEF 14A with the SEC pursuant to Section 14(a) of the Exchange Act its proxy statement (the "2024 Ready Capital Proxy Statement"), which contained material misstatements and omissions. The 2024 Ready Capital Proxy asked shareholders to vote to, *inter alia*: (1) elect seven directors to serve on the Ready Capital Board until the 2025 annual meeting; (2) ratify the appointment of Deloitte & Touche LLP as Ready Capital's independent registered public accountant for fiscal year 2024; and (3) approve on an advisory basis the compensation of Ready Capital's named executive officers.

131.    In a section titled "Role of Our Board and Risk Oversight," the 2024 Ready Capital Proxy stated the following about the Board's risk oversight responsibilities, in relevant part:

> Pursuant to our charter and Bylaws, our business and affairs are managed under the direction of our board of directors. Our board of directors has the responsibility for establishing broad corporate policies and for our overall performance and direction but is not involved in our day-to-day operations. Members of our board of directors keep informed of our business by participating in meetings of our board of directors

and its committees, by reviewing analyses, reports and other materials provided to them and through discussions with our Manager and our executive officers.

In connection with their oversight of risk to our business, our board of directors and the Audit Committee consider feedback from our Manager concerning the risks related to our business, operations, and strategies. The Audit Committee discusses and reviews policies with respect to our risk assessment and risk management, including guidelines and policies to govern the process by which risk assessment and risk management is undertaken, the adequacy of our insurance coverage, our interest rate risk management, our counterparty and credit risks, our capital availability, and refinancing risks. Our Manager regularly reports to our board of directors on our leverage policies, our asset origination and acquisition processes, any asset impairments, and our qualification as a REIT and whether we remain excluded from registration as an investment company under the Investment Company Act of 1940, as amended. Members of our board of directors routinely meet with our Manager and our executive officers, as appropriate, in connection with their consideration of matters submitted for the approval of our board of directors and the risks associated with such matters.

Our board of directors believes that its composition protects stockholder interests and provides sufficient independent oversight of our Manager. The independent directors meet separately from the personnel of our Manager on at least a quarterly basis and are very active in the oversight of our Company. The independent directors oversee such critical matters as the integrity of our financial statements, the evaluation and compensation of our Manager and the selection and evaluation of directors.

Each independent director has the ability to add items to the agenda of board of directors' meetings or raise subjects for discussion that are not on the agenda for that meeting. In addition, our board of directors and each board of directors committee have complete and open access to our Manager and its officers, employees and other personnel who support our Manager in providing services to us under the Management Agreement.

The board of directors believes that it should remain free to determine whether the roles of Chairman and Chief Executive Officer should be combined or separated based on circumstances and the composition of the board of directors at any given time. The board of directors has determined that a combined Chairman and Chief Executive Officer is in the best interests of the company at this time and has chosen Thomas E. Capasse, who is our Chief Executive Officer, to serve also as the Chairman of the Board. Our board of directors believes that its majority independent composition and the roles that our independent directors perform, provide effective corporate governance at the board of directors level and independent oversight of both our board of directors and our Manager. Our board believes that current governance structure, when combined with the functioning of the independent director component of our board of directors and our overall

corporate governance structure, strikes an appropriate balance between strong and consistent leadership and independent oversight of our business and affairs.

132.    Defendants Capasse, Ross, Reese, Marshall, Mielle, Nathan, Ahlborn and Sinai caused the 2024 Ready Capital Proxy to be false and misleading at the time of issuance because it failed to disclose, *inter alia,* that: (1) a material portion of borrowers within Ready Capital's originated portfolio were experiencing significant financial distress due to high interest rates that had increased their borrowing costs; (2) an oversupply of multifamily properties in Ready Capital's markets had severely limited its borrowers' ability to raise their rents sufficiently to cover their growing debt costs; (3) a major development project acquired in the Mosaic Merger (the Ritz-Carlton), accounting for approximately $500 million of Ready Capital's acquired loan portfolio, had experienced  catastrophic setbacks since its inception, including significant cost overruns, construction delays, and funding shortfalls; (4) that, as a result of (1)–(3) above, Ready Capital's CECL reserves and expected credit losses were materially understated; and (5) that, as a result of (1)–(4) above, Ready Capital's financial projections regarding Ready Capital's Distributable Earnings per share, dividends per share, and book value per share had no basis in fact when made.

133.    As a result of Defendants Capasse, Ross, Reese, Marshall, Mielle, Nathan, Ahlborn and Sinai causing the 2024 Ready Capital Proxy to be false and misleading, Ready Capital shareholders voted, *inter alia* to: (1) elect seven directors to serve the Ready Capital Board until the 2025 annual meeting; (2) ratify the appointment of Deloitte & Touche LLP as Ready Capital's independent registered public accountant for fiscal 2024; and (3) approve on an advisory basis the compensation of Ready Capital's named executive officers.

## THE TRUTH EMERGES

116.    The truth fully emerged on March 3, 2025 when, before the market opened, Ready Capital issued the Q4 2024 Press Release. This release revealed Ready Capital had increased its CECL reserve during the quarter by $277 million, reducing book value per share of common stock to $10.61 as of December 31, 2024, and causing Ready Capital to fall very far short of the $15.10 per share projection included in the Joint Proxy. The Q4 2024 Press Release further revealed that Ready Capital was reducing its quarterly cash dividend to *$0.125 per share* of common stock to "align with anticipated cash earnings." This constituted a serious shortcoming in comparison to the *$1.60 dividend per share* for fiscal 2025 figure projected in the Joint Proxy. Finally, the Q4 2024 Press Release reported that Ready Capital had generated Distributable Earnings per share of common stock of only *$0.07* in fiscal 2024—just $0.97 of distributable earnings before realized losses on investments, net tax—a miniscule fraction of the *$1.60* in annual Distributable Earnings per share set for in the proxy.

117.    The Q4 2024 Press Release included statements made by Defendant Capasse, who stated that Ready Capital's multifamily-related business had been negatively impacted during the year by "'higher rates, inflationary pressures, and lower rent growth.'" The Q4 2024 Press Release further quoted Defendant Capasse as stating that Ready Capital was "'fully reserving for all of [its] non-performing loans in [its] CRE portfolio,'" which effectively reduced Ready Capital's book value. The press release continued, representing the following, in relevant part:

> "Entering 2025, we have taken decisive actions to stabilize and better position our balance sheet going forward by fully reserving for all of our non-performing loans in our CRE portfolio. While this reduces our book value per share in the short term, we believe it provides a path to recovery in our net interest margin through the accelerated resolution of our non-performing loans to generate liquidity for reinvestment in higher-yielding new originations. Additionally, we have adjusted our dividend to $0.125 per share to align with anticipated cash earnings to preserve capital for reinvestment and share repurchases with potential upward bias coincident with the recovery in earnings."

118.     During a conference call held the same day to discuss said financial results, Defendant Capasse stated that Ready Capital's reserve action lowered Ready Capital's basis in non-performing loans and would thus provide its "asset managers with more options for accelerated resolution" of its non-performing assets. Defendant Capasse continued, stating that as part of its resolution efforts, Ready Capital would be bifurcating its commercial real estate portfolio into core and non-core categories. Defendant Capasse stated that "core" assets were loans Ready capital intended to hold to maturity, and "non-core" assets were those which Ready Capital "tagged with aggressive liquidation strategies." Ready Capital's non-core portfolio, per Defendant Capasse, contained *$1.2 billion* in loans, comprised nearly entirely of Ready Capital's originated loans and the Ritz-Carlton. Ready Capital's CCO stated that the loans were modified loans with "lower yields," a "less viable path to stabilization," and a "higher probability of foreclosure," absent liquidation. CCO Adam Zausmer stated, in relevant part:

> On the non-core, this is really the bucket of more challenging loans that we've deemed this represents 17% of the portfolio. These are where we're going to have short term holdings and the primary asset management strategy is, as Tom mentioned, really an expeditious liquidation. These assets have lower yields, less viable path to stabilization and takeout, the multi-family specifically agency takeout, little or no fresh equity from the borrowers inside of those modifications. And we feel that ultimately, if we don't liquidate specifically on the loan side, there'll be a higher probability of foreclosure.

119.     Defendant Capesse then expanded on these remarks, stating that Ready Capital had been trying to "stay alive to '25," at which point it was expected that interest rates would ease, which ultimately would cause previously modified loans to be "split into two buckets." Defendant Capesse, in relevant part, stated:

> Yeah, and I want to just add to that, Doug, the – yeah, I think this is systemic to the industry, especially on the multi-family side where you look to bridge to – I'm sorry – to loans that have been made it through the rate hike period and 2025.
>
> There's an old saying a year ago, you stay alive to '25. Well, rates didn't

go down. So what you're now seeing is loans that were previously modified split into two buckets.

120.    Furthermore, a presentation issued in connection with the Q4 2024 earnings call further revealed that Ready Capital's non-core, originated portfolio was entirely composed of loans originated in fiscal 2022 and prior (before the Merger), as shown below:



121.    Defendant Capesse also revealed that the Mosaic portion of Ready Capital's non-core portfolio's mixed-use asset was the Ritz-Carlton. Defendant Capesse stated that while Ready Capital intended originally "to refinance the construction into a bridge loan, the current appraisal and other factors favored ownership and serial asset disposition on the components." The result of the property's appraised value was a reservation of "$130 million of [Ready Capital's] original exposure to mark the asset to its as is value."

122.    On this news, the price per share of Ready Capital's common stock dropped $1.91 per share, or approximately 27.5%, from closing at $6.93 on February 28, 2025, the previous

trading day, to close at $5.07 per share the following day, on March 3, 2025, amid extraordinary trading volume of 22,960,800 shares.

## REPURCHASES DURING THE RELEVANT PERIOD

123.    During the Relevant Period, the Individual Defendants caused the Ready Capital to initiate repurchases of its common stock that substantially damaged Ready Capital. In total, Ready Capital spent an aggregate amount of approximately $105.5 million to repurchase approximately 12.6 million shares of its own common stock at artificially inflated prices between May 2023 and February 2025.

124.    According to the quarterly report Ready Capital filed on Form 10-Q with the SEC on August 8, 2023 (the "Q2 2023 10-Q"), between May 1, 2023 and May 31, 2023, Ready Capital purchased 64,370 shares of its common stock at an average price of approximately $10.25 per share for a total cost to the Company of approximately $659,793.

125.    As Ready Capital's stock was actually worth only $5.07 per share, the price at which it was trading when the market closed on March 3, 2025, the Company overpaid by approximately $333,437 for repurchases of its own stock between May 1, 2023 and May 31, 2023.

126.    According to the Q2 2023 10-Q, between June 1, 2023 and June 30, 2023, Ready Capital purchased 1,667,852 shares of its common stock at an average price of approximately $10.82 per share for a total cost to the Company of approximately $18 million.

127.    As Ready Capital's stock was actually worth only $5.07 per share, the price at which it was trading when the market closed on March 3, 2025, the Company overpaid by approximately $9.5 million for repurchases of its own stock between June 1, 2023 and June 30, 2023.

128.    According to the quarterly report Ready Capital filed on Form 10-Q with the SEC on November 8, 2023 (the "Q3 2023 10-Q"), between July 1, 2023 and July 31, 2023, Ready Capital purchased 76,112 shares of its common stock at an average price of approximately $11.28 per share for a total cost to the Company of approximately $858,543.

129.    As Ready Capital's stock was actually worth only $5.07 per share, the price at which it was trading when the market closed on March 3, 2025, the Company overpaid by approximately $472,656 for repurchases of its stock between July 1, 2023 and July 31, 2023.

130.    According to the Q3 2023 10-Q, between August 1, 2023 and August 31, 2023, Ready Capital purchased 11,130 shares of its common stock at an average price of approximately $10.72 per share for a total cost to the Company of approximately $119,314.

131.    As Ready Capital's stock was actually worth only $5.07 per share, the price at which it was trading when the market closed on March 3, 2025, the Company overpaid by approximately $62,885 for repurchases of its stock between August 1, 2023 and August 31, 2023.

132.    According to the annual report Ready Capital filed on Form 10-K with the SEC on February 28, 2024 (the "2023 10-K"), between October 1, 2023 and October 31, 2023, Ready Capital purchased 339 shares of its common stock at an average price of approximately $9.90 per share for a total cost to the Company of approximately $3,356.

133.    As Ready Capital's stock was actually worth only $5.07 per share, the price at which it was trading when the market closed on March 3, 2025, the Company overpaid by approximately $1,637 for repurchases of its stock between October 1, 2023 and October 31, 2023.

134.    According to the 2023 10-K, between November 1, 2023 and November 30, 2023, Ready Capital purchased 3,208 shares of its common stock at an average price of approximately $9.87 per share for a total cost to the Company of approximately $31,633.

135.    As Ready Capital's stock was actually worth only $5.07 per share, the price at which it was trading when the market closed on March 3, 2025, the Company overpaid by approximately $15,398 for repurchases of its stock between November 1, 2023 and November 30, 2023.

136.    According to the 2023 10-K, between December 1, 2023 and December 31, 2023, Ready Capital purchased 72,014 shares of its common stock at an average price of approximately $10.25 per share for a total cost to the Company of approximately $738,144.

137.    As Ready Capital's stock was actually worth only $5.07 per share, the price at which it was trading when the market closed on March 3, 2025, the Company overpaid by approximately $373,033 for repurchases of its stock between December 1, 2023 and December 30, 2023.

138.    According to the quarterly report Ready Capital filed on Form 10-Q with the SEC on May 10, 2024 (the "Q1 2024 10-Q"), between January 1, 2024 and January 31, 2024, Ready Capital purchased 13,848 shares of its common stock at an average price of approximately $10.02 per share for a total cost to the Company of approximately $138,757.

139.    As Ready Capital's stock was actually worth only $5.07 per share, the price at which it was trading when the market closed on March 3, 2025, the Company overpaid by approximately $68,548 for repurchases of its stock between January 1, 2024 and January 31, 2024.

140.    According to the Q1 2024 10-Q, between February 1, 2024 and February 29, 2024, Ready Capital purchased 205,806 shares of its common stock at an average price of approximately $8.97 per share for a total cost to the Company of approximately $1.8 million.

141.    As Ready Capital's stock was actually worth only $5.07 per share, the price at which it was trading when the market closed on March 3, 2025, the Company overpaid by

approximately $802,643 for repurchases of its stock between February 1, 2024 and February 29, 2024.

142.    According to the Q1 2024 10-Q, between March 1, 2024 and March 31, 2024, Ready Capital purchased 2,025,055 shares of its common stock at an average price of approximately $8.88 per share for a total cost to the Company of approximately $17.9 million.

143.    As Ready Capital's stock was actually worth only $5.07 per share, the price at which it was trading when the market closed on March 3, 2025, the Company overpaid by approximately $7.7 million for repurchases of its stock between March 1, 2024 and March 31, 2024.

144.    According to the quarterly report Ready Capital filed on Form 10-Q with the SEC on August 9, 2024 (the "Q2 2024 10-Q"), between April 1, 2024 and April 30, 2024, Ready Capital purchased 1,578,263 shares of its common stock at an average price of approximately $8.57 per share for a total cost to the Company of approximately $13.5 million.

145.    As Ready Capital's stock was actually worth only $5.07 per share, the price at which it was trading when the market closed on March 3, 2025, the Company overpaid by approximately $5.5 million for repurchases of its stock between April 1, 2024 and April 30, 2024.

146.    According to the Q2 2024 10-Q, between May 1, 2024 and May 31, 2024, Ready Capital purchased 774,952 shares of its common stock at an average price of approximately $8.70 per share for a total cost to the Company of approximately $6.7 million.

147.    As Ready Capital's stock was actually worth only $5.07 per share, the price at which it was trading when the market closed on March 3, 2025, the Company overpaid by approximately $2.8 million for repurchases of its stock between May 1, 2024 and May 31, 2024.

148.    According to the quarterly report Ready Capital filed on Form 10-Q with the SEC on November 12, 2024 (the "Q3 2024 10-Q"), between July 1, 2024 and July 31, 2024, Ready Capital purchased 548 shares of its common stock at an average price of approximately $9.13 per share for a total cost to the Company of approximately $5,003.

149.    As Ready Capital's stock was actually worth only $5.07 per share, the price at which it was trading when the market closed on March 3, 2025, the Company overpaid by approximately $2,225 for repurchases of its stock between July 1, 2024 and July 31, 2024.

150.    According to the 2024 10-K, between December 1, 2024 and December 31, 2024, Ready Capital purchased 5,843,463 shares of its common stock at an average price of approximately $7.35 per share for a total cost to the Company of approximately $42.9 million.

151.    As Ready Capital's stock was actually worth only $5.07 per share, the price at which it was trading when the market closed on March 3, 2025, the Company overpaid by approximately $13.3 million for repurchases of its stock between December 1, 2024 and December 31, 2024.

152.    According to the quarterly report Ready Capital filed on Form 10-Q with the SEC on May 9, 2025 (the "Q1 2025 10-Q"), between January 1, 2025 and January 31, 2025, Ready Capital purchased 207 shares of its common stock at an average price of approximately $6.62 per share for a total cost to the Company of approximately $1,370.

153.    As Ready Capital's stock was actually worth only $5.07 per share, the price at which it was trading when the market closed on March 3, 2025, the Company overpaid by approximately $321 for repurchases of its stock between January 1, 2025 and January 31, 2025.

154.   According to the Q1 2025 10-Q, between February 1, 2025 and February 28, 2025, Ready Capital purchased 286,280 shares of its common stock at an average price of approximately $6.62 per share for a total cost to the Company of approximately $1.9 million.

155.   As Ready Capital's stock was actually worth only $5.07 per share, the price at which it was trading when the market closed on March 3, 2025, the Company overpaid by approximately $443,734 for repurchases of its stock between February 1, 2025 and February 28, 2025.

156.   Thus, in total, during the Relevant Period, Ready Capital overpaid for repurchases of its own common stock by approximately ***$41.5 million***.

## DAMAGES TO BROADMARK

157.   As a direct and proximate result of the Individual Defendants' conduct, Broadmark has lost and will continue to lose and expend many millions of dollars.

158.   Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

159.   Such losses include, but are not limited to, over $41.5 million that the Company overpaid when it repurchased, at the direction of the Individual Defendants, its own common stock at artificially inflated prices during the Relevant Period before the truth emerged.

160.   Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

161.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

162.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

163.    As a direct and proximate result of the Individual Defendants' conduct, Broadmark has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's, and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

164.    Plaintiff brings this action derivatively and for the benefit of Broadmark and Ready Capital to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Broadmark, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act.

165.    Broadmark and Ready Capital are named solely as nominal parties in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

166.    Plaintiff is a Broadmark shareholder and has been a Broadmark shareholder continuously *prior* to the Merger and a Ready Capital shareholder continuously *since* the Merger. Plaintiff will adequately and fairly represent the interests of Broadmark and Ready Capital in

enforcing and prosecuting their rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

167.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

168.    A pre-suit demand on the Ready Capital Board is futile and, therefore, excused. Ready Capital's Board as of the time of filing consists of the following seven individuals: Defendants Capasse, Ross, Marshall, Mielle, Nathan, Reese, and Sinai (collectively, the "Ready Capital Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the seven Ready Capital Director-Defendants that were on the Board at the time this action was filed.

169.    Demand is excused as to all of the Ready Capital Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause Ready Capital to make false and misleading statements and omissions of material facts, while, at the same time, they caused Ready Capital to repurchase its own stock at artificially inflated prices. This renders the Ready Capital Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

170.    Demand is further excused because of the indemnification provision in the Joint Proxy, which Joint Proxy every Ready Capital Director-Defendant solicited and signed, immunizing all the Ready Capital Director-Defendants from liability, which renders them unable to impartially investigate the charges and decide whether to pursue action against the Individual Defendants and the other perpetrators of the scheme described herein. Indeed, in the Joint Proxy, Annex A ("Agreement and Plan of Merger"), Section 6.8 (the "Indemnification Provision"), states

that the Individual Defendants and all other directors, officers, and employees of the Company and its subsidiaries at the time of the Merger are to be held harmless against all losses and claims arising out of the their employment by the Company or its subsidiaries. The Indemnification Provision provides, in relevant part, that:

(a)   Without limiting any other rights that any Indemnified Person (as defined below) may have pursuant to the Company's Organizational Documents, any employment agreement or any indemnification agreement in effect on the date hereof or otherwise (which agreements shall be assumed by Parent and the Surviving Company), from and after the Effective Time, the Surviving Company shall, and Parent shall cause the Surviving Company to, indemnify, defend and hold harmless each Person who is now, or has been at any time prior to the date of this Agreement or who becomes prior to the Effective Time, a director, officer or employee of the Company or any of its Subsidiaries or is or was serving at the request of the Company or any of its Subsidiaries as a director, officer, employee or agent of another corporation, partnership, limited liability company, joint venture, trust or other enterprise (the "Indemnified Persons") against and from all losses, claims, damages, costs, fines, penalties, expenses (including attorneys' and other professionals' fees and expenses), liabilities or judgments or amounts that are paid in settlement of, or incurred in connection with any threatened or actual Proceeding to which such Indemnified Person is a party or is otherwise involved (including as a witness) based, in whole or in part, on or arising, in whole or in part, out of the fact that such Person is or was a director, officer or employee of the Company or any of its Subsidiaries or is or was serving at the request of the Company or any of its Subsidiaries as a director, officer, employee or agent of another corporation, partnership, limited liability company, joint venture, Employee Benefit Plan, trust or other enterprise or by reason of anything done or not done by such Person in any such capacity, whether pertaining to any act or omission occurring or existing prior to, at or after the Effective Time and whether asserted or claimed prior to, at or after the Effective Time ("Indemnified Liabilities"), including all Indemnified Liabilities based in whole or in part on, or arising in whole or in part out of, or pertaining to, this Agreement or the Transactions, in each case, to the extent any such Indemnified Person would be entitled to be so indemnified by the Company or its Subsidiaries on the date hereof pursuant to agreements or arrangements in place, including indemnification agreements, organizational documents or otherwise.

(b)   Parent and the Surviving Company shall not amend, repeal or otherwise modify any provision in the Organizational Documents of the Surviving Company or its Subsidiaries in any manner that would affect adversely the rights thereunder or under the Organizational Documents of the Surviving Company or any of its Subsidiaries of any Indemnified Person to indemnification,

exculpation and advancement except to the extent required by applicable Law. Parent shall, and shall cause the Surviving Company and its Subsidiaries to, fulfill and honor any indemnification, expense advancement or exculpation agreements between the Company or any of its Subsidiaries and any of its directors, officers or employees existing on the date of this Agreement.

\* \* \*

(d)  On or prior to the Closing Date, the Company shall put in place, and fully prepay immediately prior to the Effective Time, "tail" insurance policies (collectively, the "D&O Insurance") with a claims period of at least six (6) years from the Effective Time from an insurance carrier with the same or better credit rating as the Company's current insurance carrier with respect to directors' and officers' liability insurance, fiduciary liability insurance and employment practices liability insurance in an amount and scope at least as favorable as the Company's existing policies with respect to matters, acts or omissions existing or occurring at or prior to the Effective Time.

171.    Thus, per the Agreement and Plan of Merger's Indemnification Provision, the Individual Defendants cannot be held liable for any of their intentional or reckless misconduct alleged herein. The Individual Defendants will be holders of home-free tickets. This clear absolution of any wrongdoing in the face of the misconduct alleged herein is clear evidence that the Merger was conducted in bad faith and at least in part to deprive the Company of its claims against the Individual Defendants.

172.    In complete abdication of their fiduciary duties, the Ready Capital Director-Defendants either knowingly or recklessly caused or permitted Ready Capital to issue materially false and misleading statements. Specifically, the Ready Capital Director-Defendants caused Ready Capital to issue false and misleading statements intended to make Ready Capital's portfolio appear more profitable and stable to investors. Moreover, the Ready Capital Director-Defendants caused Ready Capital to fail to maintain internal controls. As a result of the foregoing, the Ready Capital Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

173.    Additional reasons that demand on Defendant Capasse is futile follow. Defendant Capasse has served as CEO and CIO of Ready Capital and as Chairman of the Ready Capital Board since October 2016. As such, Ready Capital provides Defendant Capasse with his principal occupation for which he receives lucrative compensation. Thus, as Ready Capital admits, he is a non-independent director. As CEO and a director throughout the Relevant Period, Defendant Capasse was ultimately responsible for all the false and misleading statements and omissions that were made by or on behalf of Ready Capital. As Ready Capital's highest officer and a trusted director, he conducted little, if any, oversight of the scheme to cause Ready Capital to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Capasse is a defendant in the Securities Class Action. Additionally, Defendant Capasse signed the false and misleading Joint Proxy which caused the shareholders of Ready Capital and Broadmark to vote in favor of the Merger. Finally, Defendant Capasse is a cofounder of Defendant Waterfall, and thus enjoyed both lucrative and compelling compensation for effecting the Merger. For these reasons, Defendant Capasse breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

174.    Additional reasons that demand on Defendant Marshall is futile follow. Defendant Marshall has served as a Ready Capital director since December 2022. He also currently serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Marshall has received and continues to receive handsome compensation for his role as a director. As a trusted Ready Capital director, he conducted little, if any, oversight of the scheme to cause Ready Capital to make false and misleading statements,

consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also signed the false and misleading Joint Proxy which caused the shareholders of Ready Capital and Broadmark to vote in favor of the Merger. Moreover, Defendant Marshall is named as a defendant in the Securities Class Action. For these reasons, Defendant Marshall breached his fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon him is futile and, therefore, excused.

175.    Additional reasons that demand on Defendant Mielle is futile follow. Defendant Mielle has served as a Ready Capital director since March 2021. She also served as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. She currently serves as the Chair of the Audit Committee and as a member of the Compensation Committee. Defendant Mielle has received and continues to receive handsome compensation for her role as a director. As a trusted Ready Capital director, she conducted little, if any, oversight of the scheme to cause Ready Capital to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. She also signed the false and misleading Joint Proxy which caused the shareholders of Ready Capital and Broadmark to vote in favor of the Merger. Moreover, Defendant Mielle is a defendant in the Securities Class Action. For these reasons, Defendant Mielle breached her fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon her is futile and, therefore, excused.

176.    Additional reasons that demand on Defendant Nathan is futile follow. Defendant Nathan has served as a Ready Capital director since March 2019. He also serves as a member of

the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Nathan has received and continues to receive handsome compensation for his role as a director. As a trusted Ready Capital director, he conducted little, if any, oversight of the scheme to cause Ready Capital to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also signed the false and misleading Joint Proxy which caused the shareholders of Ready Capital and Broadmark to vote in favor of the Merger. Moreover, Defendant Nathan is named as a defendant in the Securities Class Action. For these reasons, Defendant Nathan breached his fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon him is futile and, therefore, excused.

177.    Additional reasons that demand on Defendant Reese is futile follow. Defendant Reese has served as a Company director since October 2016 and as Ready Capital's Lead Independent Director since April 2025. He also serves as the Chairman of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Reese has received and continues to receive handsome compensation for his role as a director. As a trusted Ready Capital director, he conducted little, if any, oversight of the scheme to cause Ready Capital to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also signed the false and misleading Joint Proxy which caused the shareholders of Ready Capital and Broadmark to vote in favor of the Merger. Moreover, Defendant Reese is named as a defendant in the Securities Class Action. For these reasons, Defendant Reese breached his fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon him is futile and, therefore, excused.

178.    Additional reasons that demand on Defendant Ross is futile follow. Defendant Ross has served as Ready Capital's President and as a Ready Capital director since October 2016. As such, Ready Capital provides Defendant Ross with his principal occupation for which he receives lucrative compensation. Thus, as Ready Capital admits, he is a non-independent director. As the trusted President and as a Ready Capital director, he conducted little, if any, oversight of the scheme to cause Ready Capital to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. What is more, Defendant Ross is a co-founder and manager of Defendant Waterfall, and thus materially benefitted from the closing of the Merger, which would not have occurred but for the solicitation of the materially false and misleading Joint Proxy. He also signed the false and misleading Joint Proxy which caused the shareholders of Ready Capital and Broadmark to vote in favor of the Merger. Moreover, Defendant Ross is named as a defendant in the Securities Class Action. For these reasons, Defendant Ross breached his fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon him is futile and, therefore, excused.

179.    Additional reasons that demand on Defendant Sinai is futile follow. Defendant Sinai has served as a Ready Capital director since October 2016. He also serves as the Chairman of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Sinai has received and continues to receive handsome compensation for his role as a director. As a trusted Ready Capital director, he conducted little, if any, oversight of the scheme to cause Ready Capital to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also signed the false and

misleading Joint Proxy which caused the shareholders of Ready Capital and Broadmark to vote in favor of the Merger. Moreover, Defendant Sinai is named as a defendant in the Securities Class Action. For these reasons, Defendant Sinai breached his fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon him is futile and, therefore, excused.

180.    Additional reasons that demand on the Ready Capital Board is futile follow.

181.    All of the Ready Capital Director-Defendants solicited the 2023 Ready Capital Proxy pursuant to Section 14(a) of the Exchange Act, which contained materially false and misleading statements. As a result of the 2023 Ready Capital Proxy being false and misleading, Company stockholders voted, *inter alia*, to approve the 2023 Incentive Plan, thereby allowing the Ready Capital Director-Defendants to materially benefit thereunder in the future. Indeed, these Ready Capital Director-Defendants would not have received this benefit without the solicitation of the false and misleading 2023 Ready Capital Proxy since, without the 2023 Incentive Plan being approved, the 2013 Plan would've expired in mere months. Indeed, the Company admitted that, "if the 2023 Plan [was] not approved by [Company] stockholders," Ready Capital would "not have an equity plan under which to grant awards to our directors, officers, advisors, consultants and other personnel, including our Manager and our Manager's affiliates and personnel of our Manager or our Manager's affiliates" following the expiration of the 2013 Plan on November 25, 2023. For these reasons, too, demand against the Ready Capital Director-Defendants is further excused as futile.

182.    Defendants Nathan, Reese, and Mielle (collectively, the "Ready Capital Audit Committee Defendants") served as members of Ready Capital's Audit Committee at all relevant times. As such, they were responsible for the effectiveness of Ready Capital's internal controls,

the truth and accuracy of Ready Capital's financial statements, and Ready Capital's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting Ready Capital to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Ready Capital Board oversight of Ready Capital's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics. Thus, the Ready Capital Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

183. Broadmark and the Company have been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Ready Capital Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Broadmark and/or Ready Capital any part of the damages which Broadmark and/or Ready Capital suffered and will continue to suffer thereby. Thus, any demand upon the Ready Capital Director-Defendants would be futile.

184. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Ready Capital Director-Defendants can claim exculpation from their violations of duty pursuant to Ready Capital's charter (to the extent such a provision exists). As a majority of the Ready Capital Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about

whether to pursue this action on behalf of the shareholders of Broadmark and/or Ready Capital. Accordingly, demand is excused as being futile.

185.    The acts complained of herein constitute violations of fiduciary duties owed by Ready Capital's officers and directors, and these acts are incapable of ratification.

186.    The Ready Capital Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused Ready Capital to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Ready Capital. If there is a directors' and officers' liability insurance policy covering the Ready Capital Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by Ready Capital against the Ready Capital Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Ready Capital Director-Defendants were to sue themselves or certain of the officers of Ready Capital, there would be no directors' and officers' insurance protection. Accordingly, the Ready Capital Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Ready Capital Director-Defendants is futile and, therefore, excused.

187.    If there is no directors' and officers' liability insurance, then the Ready Capital Director-Defendants will not cause Ready Capital to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

188.    Thus, for all the reasons set forth above, all of the Ready Capital Director-Defendants, and, if not all of them, at least four of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Ready Capital Board is excused as futile.

### FIRST CLAIM
### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

134.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

135.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Ready Capital. Not only is Ready Capital now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Ready Capital by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially inflated prices, damaging Ready Capital.

136.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify Ready Capital's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

137.    The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue

and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Ready Capital not misleading.

138.    The Individual Defendants, as top executives, acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of Ready Capital, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

139.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

140.    Plaintiff on behalf of Broadmark and Ready Capital has no adequate remedy at law.

### SECOND CLAIM
**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

130.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

131.    The Individual Defendants, by virtue of their positions with Broadmark and/or Ready Capital and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Broadmark and/or Ready Capital and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause the Company to engage in the illegal conduct and practices complained of herein.

132.    Plaintiff, on behalf of Broadmark and Ready Capital, has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Violations of Sections 14(a) of the Exchange Act**

133.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

134.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

135.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

136.    The Individual Defendants caused the Joint Proxy to be false and misleading by failing to disclose, *inter alia,* that: (1) a material portion of borrowers within Ready Capital's originated portfolio were experiencing significant financial distress due to high interest rates that had increased their borrowing costs; (2) an oversupply of multifamily properties in Ready Capital's markets had severely limited its borrowers' ability to raise their rents sufficiently to cover their growing debt costs; (3) a major development project acquired in the Mosaic Merger (the Ritz-

Carlton), accounting for approximately $500 million of Ready Capital's acquired loan portfolio, had experienced catastrophic setbacks since its inception, including significant cost overruns, construction delays, and funding shortfalls; (4) that, as a result of (1)–(3) above, Ready Capital's CECL reserves and expected credit losses were materially understated; and (5) that, as a result of (1)–(4) above, Ready Capital's financial projections regarding Ready Capital's Distributable Earnings per share, dividends per share, and book value per share had no basis in fact when made. As a result of the foregoing, Ready Capital's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

137.    The Joint Proxy was also false and misleading because the Company's Board was not adequately performing its risk oversight functions.

138.    As a result of Individual Defendants causing the Joint Proxy to be false and misleading, Company shareholders voted, *inter alia*, to: (1) "consider and vote on a proposal (the 'Broadmark Merger Proposal') to approve the merger of Broadmark with and into RCC Merger Sub, LLC ('Merger Sub') . . . and other transactions contemplated in connection therewith"; (2) to vote on the "'Broadmark Compensation Proposal' to approve . . . the compensation that may be paid or become payable to Broadmark's named executive officers that is based on or otherwise relates to the Merger"; and (3) to adjourn the special meeting "if necessary or appropriate, including to solicit additional proxies if there are not sufficient votes to approve [the Merger]." The Individual Defendants, by causing the Joint Proxy to be false and misleading, also caused the Ready Capital shareholders to vote, *inter alia*, to vote to: (1) approve a proposal to issue Ready Capital common stock pursuant to the Merger Agreement; and (2) adjourn the Ready Capital special meeting "if necessary or appropriate, including to solicit additional proxies if there are not sufficient votes to approve" such action.

139.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Joint Proxy.

140.    Defendants Capasse, Ross, Reese, Marshall, Mielle, Nathan, Sinai, Petro, Ahlborn, Luebbers, Hirsch, and Mayfield caused the 2023 Ready Capital Proxy to be false and misleading by failing to disclose, *inter alia,* that: (1) a material portion of borrowers within Ready Capital's originated portfolio were experiencing significant financial distress due to high interest rates that had increased their borrowing costs; (2) an oversupply of multifamily properties in Ready Capital's markets had severely limited its borrowers' ability to raise their rents sufficiently to cover their growing debt costs; (3) a major development project acquired in the Mosaic Merger (the Ritz-Carlton), accounting for approximately $500 million of Ready Capital's acquired loan portfolio, had experienced catastrophic setbacks since its inception, including significant cost overruns, construction delays, and funding shortfalls; (4) that, as a result of (1)–(3) above, Ready Capital's CECL reserves and expected credit losses were materially understated; and (5) that, as a result of (1)–(4) above, Ready Capital's financial projections regarding Ready Capital's Distributable Earnings per share, dividends per share, and book value per share had no basis in fact when made. As a result of the foregoing, Ready Capital's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

141.    The 2023 Ready Capital Proxy was also false and misleading because, despite assertions to the contrary, the Ready Capital Board was not adequately performing its risk oversight functions.

142.    As a result of Defendants Capasse, Ross, Reese, Marshall, Mielle, Nathan, Sinai, Ahlborn, Petro, Luebbers, Hirsch, and Mayfield causing the 2023 Ready Capital Proxy to be false and misleading, Ready Capital shareholders voted, *inter alia*, to: (1) vote to elect new directors to

the Ready Capital Board until the 2024 shareholders meeting; (2) ratify the appointment of Deloitte & Touche LLP as Ready Capital's independent registered public accounting firm; (3) approve on an advisory basis the compensation of Ready Capital's named executive officers; and (4) approve and adopt the Ready Capital Corporation 2023 Equity Incentive Plan.

143.    Ready Capital was damaged as a result of Defendants Capasse, Ross, Reese, Marshall, Mielle, Nathan, Sinai, Petro, Ahlborn, Luebbers, Hirsch, and Mayfield's material misrepresentations and omissions in the 2023 Ready Capital Proxy Statement.

144.    Defendants Capasse, Ross, Reese, Marshall, Mielle, Nathan, Ahlborn and Sinai additionally caused the 2024 Ready Capital Proxy to be false and misleading by failing to disclose, *inter alia,* that: (1) a material portion of borrowers within Ready Capital's originated portfolio were experiencing significant financial distress due to high interest rates that had increased their borrowing costs; (2) an oversupply of multifamily properties in Ready Capital's markets had severely limited its borrowers' ability to raise their rents sufficiently to cover their growing debt costs; (3) a major development project acquired in the Mosaic Merger (the Ritz-Carlton), accounting for approximately $500 million of Ready Capital's acquired loan portfolio, had experienced  catastrophic setbacks since its inception, including significant cost overruns, construction delays, and funding shortfalls; (4) that, as a result of (1)–(3) above, Ready Capital's CECL reserves and expected credit losses were materially understated; and (5) that, as a result of (1)–(4) above, Ready Capital's financial projections regarding Ready Capital's Distributable Earnings per share, dividends per share, and book value per share had no basis in fact when made. As a result of the foregoing, Ready Capital's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

145.    The 2024 Ready Capital Proxy was also false and misleading because, despite assertions to the contrary, the Ready Capital Board was not adequately performing its risk oversight functions.

146.    As a result of Defendants Capasse, Ross, Reese, Marshall, Mielle, Nathan, Ahlborn and Sinai causing the 2024 Ready Capital Proxy to be false and misleading, Company shareholders voted, *inter alia*, to: (1) elect seven directors to serve on the Ready Capital Board until the 2025 annual shareholders meeting; (2) ratify the appointment of Deloitte & Touche LLP as Ready Capital's independent registered public accounting firm for fiscal 2024; and (3) to approve Ready Capital's compensation of its named executive officers.

147.    Ready Capital was damaged as a result of Defendants Capasse, Ross, Reese, Marshall, Mielle, Nathan, Ahlborn and Sinai's material misrepresentations and omissions in the 2024 Ready Capital Proxy.

148.    Plaintiff, on behalf of Broadmark and Ready Capital, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

189.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

190.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Broadmark's business and affairs.

191.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

192.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Broadmark.

193.    In breach of their fiduciary duties owed to Broadmark, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omission of material fact that failed to disclose, *inter alia,* that: (1) a material portion of borrowers within Ready Capital's originated portfolio were experiencing significant financial distress due to high interest rates that had increased their borrowing costs; (2) an oversupply of multifamily properties in Ready Capital's markets had severely limited its borrowers' ability to raise their rents sufficiently to cover their growing debt costs; (3) a major development project acquired in the Mosaic Merger (the Ritz-Carlton), accounting for approximately $500 million of Ready Capital's acquired loan portfolio, had experienced catastrophic setbacks since its inception, including significant cost overruns, construction delays, and funding shortfalls; (4) that, as a result of (1)–(3) above, Ready Capital's CECL reserves and expected credit losses were materially understated; and (5) that, as a result of (1)–(4) above, Ready Capital's financial projections regarding Ready Capital's Distributable Earnings per share, dividends per share, and book value per share had no basis in fact when made.

194.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, while, at the same time, causing the Company to repurchase millions of its own shares while the stock price was artificially inflated due to the false and misleading statements and omissions alleged herein, thus rendering them personally liable to the Company for breaching their fiduciary duties.

195.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

196.     The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

197.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

198.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

199.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, the Company has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

200.     Plaintiff, on behalf of Broadmark and Ready Capital, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

201.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

202.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Broadmark.

203.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Broadmark that was tied to the performance or artificially inflated valuation of Broadmark or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

204.     Plaintiff, as a shareholder and representative of Broadmark, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

205.     Plaintiff, on behalf of Broadmark and Ready Capital, has no adequate remedy at law.

### SIXTH CLAIM
**Against the Individual Defendants for Abuse of Control**

206.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

207.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Broadmark, for which they are legally responsible.

208.     As a direct and proximate result of the Individual Defendants' abuse of control, Broadmark has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

209.     Plaintiff, on behalf of Broadmark and Ready Capital, has no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

210.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

146.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Broadmark in a manner consistent with the operations of a publicly-held corporation.

147.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Broadmark has sustained and will continue to sustain significant damages.

148.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

149.    Plaintiff, on behalf of Broadmark and Ready Capital, has no adequate remedy at law.

## EIGHTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

150.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

151.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

152.    In addition, the Individual Defendants caused the Company to repurchase millions

of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

153.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

154.    Plaintiff, on behalf of Broadmark and Ready Capital, has no adequate remedy at law.

## NINTH CLAIM
**Against the Individual Defendants and Defendant Waterfall for Contribution Under Sections 10(b) and 21D of the Exchange Act**

155.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

156.    Broadmark, Ready Capital, Defendant Waterfall, and the Individual Defendants are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Individual Defendants' and Defendant Waterfall's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

157.    Defendant Waterfall and the Individual Defendants, because of their positions of control and authority as officers and/or directors of Broadmark, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Broadmark, including the wrongful acts complained of herein and in the Securities Class Action.

158.    Accordingly, Defendant Waterfall and the Individual Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the

Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

159.    As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendant Waterfall Individual Defendants.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Broadmark and Ready Capital, and that Plaintiff is an adequate representative of Broadmark and Ready Capital;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Broadmark and/or Ready Capital;

(c)    Determining and awarding to Broadmark and/or Ready Capital the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing the Defendants to take all necessary actions to reform and improve corporate governance and internal procedures to comply with applicable laws and to avoid repeating the damaging events described herein, including, but not limited to, the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the supervision of operations; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding Broadmark  and/or Ready Capital restitution from the Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: July 18, 2025

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Docusign Envelope ID: 69895C4C-C03B-41C5-AB42-0D26D2BF9B49

## **VERIFICATION**

I, Diego Ignacio Murguia, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14__ day of July, 2025.

Firmado por:

*Diego Ignacio Murguia*

5EFB783BC1AE412...

Diego Ignacio Murguia